# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3161

_____

United States of America,          *
                                   *
        Appellee,                  *
                                   *
    v.                             *
                                   *
Steven Sandstrom,                  *
                                   *
        Appellant.                 *


_____

No. 08-3164

_____                         Appeals from the United States
                                    District Court for the
                                    Western District of Missouri.

United States of America,          *
                                   *
        Appellee,                  *
                                   *
    v.                             *
                                   *
Gary Eye,                          *
                                   *
        Appellant.                 *

_____

Submitted:  September 22, 2009
Filed: January 29, 2010

_____

Before BYE, SMITH, and COLLOTON, Circuit Judges.

_____

SMITH, Circuit Judge.

A jury found Steven Sandstrom and Gary Eye (collectively, "defendants") guilty for their roles in the shooting death of William McCay, an African-American male. Sandstrom and Eye targeted McCay because of his race while he walked on a public street. Defendants were charged with (1) interfering with federally-protected activities, in violation of 18 U.S.C. § 245(b)(2)(B) and 18 U.S.C. § 2 ("Count 1"); (2) using a firearm during and in relation to a crime of violence as set forth in Count 1, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) and 18 U.S.C. § 2 ("Count 2"); (3) interfering with federally-protected activities with death resulting, in violation of 18 U.S.C. § 245(b)(2)(B) and 18 U.S.C. § 2 ("Count 3"); (4) using a firearm during and in relation to a crime of violence causing murder as set forth in Count 3, in violation of 18 U.S.C.§ 924(c)(1)(A)(iii), (j)(1), and 18 U.S.C. § 2 ("Count 4"); (5) tampering with a witness, in violation of 18 U.S.C. § 1512(a)(1)(C), (a)(3)(A), and 18 U.S.C. § 2 ("Count 5"); (6) using a firearm during and in relation to a crime of violence causing murder as set forth in Count 5, in violation of 18 U.S.C. § 924(c)(1)(A)(iii), (j)(1), and 18 U.S.C. § 2 ("Count 6"); (7) destroying records in a federal investigation, in violation of 18 U.S.C. § 1519 and 18 U.S.C. § 2 ("Count 7"); and using a firearm to commit a felony as set forth in Count 7, in violation of 18 U.S.C. § 844(h)(1) and 18 U.S.C.§ 2 ("Count 8"). Additionally, Sandstrom was charged with retaliating against a witness, in violation of 18 U.S.C. § 1513(b)(2) ("Count 9").

The jury found Eye guilty on Counts 1–8 and Sandstrom guilty on Counts 3–9. The jury acquitted Sandstrom on Counts 1 and 2. Thereafter, the district court[1] sentenced both defendants to life imprisonment.

---

[1]The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

Sandstrom and Eye appeal, arguing that the district court (1) abused its discretion in denying their motions to sever because their defenses were mutually antagonistic and irreconcilable, resulting in an unfair trial; (2) erred in failing to dismiss multiplicitous counts in the indictment; (3) erred in denying their motions to dismiss Counts 1, 3, and 5 on the grounds that 18 U.S.C. § 245 is an unconstitutional exercise of Congress's Commerce Clause power; and (4) abused its discretion in denying their motions for a mistrial based on the prosecutor's alleged comments about their failure to testify. Additionally, Eye argues that (1) the evidence is insufficient to support his convictions on Counts 1 and 2 and (2) the district court erred in failing to grant his request for a mistrial and severance, in violation of his Sixth Amendment right to confrontation.

For the reasons set forth below, we affirm.

## I. *Background*

On the evening of March 8, 2005, Sandstrom, Eye, and Regennia Rios drove around Kansas City, Missouri, in a stolen Dodge Intrepid looking for another car to steal. Sandstrom, who was driving the Intrepid, pulled in behind a Jeep that was parked in a driveway. Sandstrom and Eye exited the Intrepid and stole the Jeep. Thereafter, Sandstrom drove the Intrepid, while Eye drove the Jeep with Rios as his passenger.[2] The parties briefly separated, but they subsequently decided to meet at the home of Jonnie Renee Chrisp, Rios's cousin.

After Sandstrom arrived at Chrisp's house, he informed Eye and Rios that "he just shot a n****r at 7-Eleven." Sandstrom appeared "frantic" and "intense." Sandstrom, Eye, and Rios then went to Sandstrom's house, where Sandstrom told his mother that he had "just shot a n****r." They then went to Sandstrom's room and

---

[2]When they first left the location, Sandstrom was driving the Intrepid with Rios as his passenger. At some point, Rios changed vehicles and got into the Jeep with Eye.

smoked methamphetamine. Eye subsequently received a phone call from Vincent Deleon, and the three left Sandstrom's house in the Intrepid to go pick up Deleon at Chrisp's house. Sandstrom brought a gun with him.

After picking up Deleon at Chrisp's house, Sandstrom, Eye, Rios and Deleon—all high on methamphetamine—left in the Intrepid to steal a third car. During the drive, Sandstrom asked Deleon "if he heard about the shooting at the 7-Eleven" and told Deleon about how he had "just shot at some n****r." Eye replied to Sandstrom that "if you get to do one, I get to do one." Sandstrom responded that "it wasn't like that, dawg," to which Eye replied, "[Y]ou started it. Let's finish it."

At some point during the drive, Sandstrom removed a .22 caliber revolver from a brace-like holster on his back. Sandstrom told Deleon that he could "kill a n****r quick." Deleon responded that he would not kill anybody but that he would "probably shoot them in the legs." Eye also said that he "would kill a n****r quick." During the drive, Sandstrom and Eye casually passed the gun back and forth between them.

The four drove into a neighborhood where Sandstrom and Eye stole the third vehicle of the night—another Jeep. Deleon drove away in the latest Jeep, while Sandstrom, Eye, and Rios returned to Sandstrom's house in the Intrepid. They arrived at Sandstrom's house between midnight and 1:00 a.m. Around 5:00 a.m. on March 9, 2005, Eye received a phone call from Deleon saying that he needed Eye to pick up Chrisp from a gas station. The three left Sandstrom's house to go pick up Chrisp and, during the drive, Eye told Sandstrom that when he saw an African American "it's on site," meaning that when Eye saw a black person, he would attack him.

When the three arrived at the gas station, Chrisp got in the car and asked to be taken to her home. Eye said that was a good idea because, if she stayed with them, "she would probably see something she didn't want to see." Sandstrom then asked Chrisp whether she had seen anything on the news about the shooting in front of the

7-Eleven and told her that he had "shot at some n****r." He also told Chrisp that she was "about to witness a homicide." Chrisp again asked to be taken to her home.

After dropping off Chrisp, Sandstrom, Eye, and Rios drove down 8th Street to "avoid police presence." When they got to Kensington Street, Rios saw William McCay, an African-American man. McCay was walking on the left side of 9th Street. Sandstrom planned to make a right turn, but Eye told him to "hit the alley" and give him the gun. Sandstrom gave Eye the gun and turned down the alley connecting 8th and 9th Streets.

Sandstrom drove to the end of the alley, and Eye put his arm out the window and fired at least two shots at McCay from roughly three to four feet away. Rios looked directly at McCay's face before ducking behind the seat. A man standing outside of a restaurant heard the shots around 6:00 a.m.. The restaurant was located approximately 80 feet from the intersection of 9th Street and Spruce Avenue. The man did not call the police because he did not think it uncommon to hear gunshots in that neighborhood.

After shooting at McCay, Eye told Sandstrom to drive around the block, and Sandstrom went left on Spruce Avenue and came back out on Kensington Avenue. When they got back to 9th Street, Eye did not see McCay. Eye "started freaking out" and became "frantic." Eye was "tripping" and could not understand how McCay was no longer there; he wanted to go find McCay. Sandstrom told Eye that he was "tripping and doing too much." Sandstrom then looked at Rios, and Rios told Sandstrom to go back and find McCay because McCay "was a case that we would probably catch." Rios meant that McCay was a witness that could implicate them in the shooting. Sandstrom then went down 9th Street until Eye told him to turn on Van Brunt Boulevard. Sandstrom turned on Van Brunt Boulevard, on 8th Street, and then on Brighton Avenue. He followed all of Eye's directions. Once on Brighton Avenue, Eye instructed Sandstrom to pull the car over, and Sandstrom complied. Rios saw

McCay again at 9th Street and Brighton Avenue. Eye got out of the car and walked toward McCay with the gun in the pocket of his sweatshirt. Eye met McCay in the middle of 9th Street and began to struggle with him. Eye pulled the gun and fired at McCay. McCay stumbled to the other side of the street and collapsed. Rios reported hearing one or two shots fired. McCay died from a single, .22 caliber gunshot wound to the chest. A 911 call at 6:12 a.m. reported hearing shots fired at the location.

After hearing Eye fire the shots, Rios told Sandstrom to go get Eye. Sandstrom then pulled up to Eye and opened the door. Eye got in the vehicle. At that point, McCay stumbled in front of the car to the other side of the street. McCay went to the other side of 9th Street. Rios did not know what happened to McCay when he got to the other side of 9th Street because the trio "sped off." They went to Sandstrom's house, where Eye and Rios retrieved one of the stolen Jeeps; Sandstrom remained in the Intrepid. Sandstrom then led Eye and Rios to a location under the Manchester Street Bridge, where Sandstrom and Eye set the Intrepid on fire. Sandstrom, Eye, and Rios subsequently left the scene in the Jeep and drove to a friend's house to pick up Deleon.

When they arrived at their friend's house, they heard a news report that three black males were suspected in the homicide at 9th Street and Brighton Avenue. Sandstrom and Eye laughed. Sandstrom declared "that's my car" when the news reported on the burning Intrepid. Deleon and Eye went outside, where Eye told Deleon that he "did that s**t" and "smoked that n****r." Sandstrom came outside, laughing, and said "yep," which Deleon understood as Sandstrom confirming what Eye had said.

Sandstrom, Eye, Rios, and Deleon left the friend's house in the Jeep. During the drive, Deleon asked Sandstrom, Eye, and Rios what they had been doing. Eye replied that he had "killed a n****r on 9th Street." And, Sandstrom told Deleon that he had "just burnt the Intrepid under the bridge." The four drove past the intersection of 9th Street and Brighton Avenue where emergency vehicles and news vans were present.

When Deleon asked what was going on, Eye bragged, "Did you think this was a game? I told you, I killed some n****r." Then, Sandstrom said, "That's where [Eye] shot that n****r." Eye started laughing and said, "[H]ere, n****r, n****r, n****r."

The four returned to Chrisp's house and turned on the news, which was reporting on the car fire. Sandstrom declared that it was "a waste of a perfectly good car." Chrisp testified that she overhead bits and pieces of their conversation, including someone saying, "I got that one off, you got that one off." Sandstrom, Eye, Rios, and Deleon then split up, with Deleon and Eye going to one location, and Sandstrom and Rios going to another. Eye told Deleon that he and Sandstrom had been playing a game called "n****r, n****r, n****r." Deleon described the game as "kill[ing] black people."

A few days after the shooting, Sandstrom, Eye, Rios, Sandstrom's girlfriend, Kristina Chirino, and a few others were in Chirino's basement. Eye bragged to the group that he killed a "n****r." Eye expressed disbelief to the group that McCay was not at the intersection at 9th Street and Spruce Avenue after the first shooting and explained that he shot McCay because McCay was in "my hood on my time." Rios explained that she told Sandstrom to turn the car around and "finish [McCay] off" because Eye had already shot him once. She also said, referring to the earlier shooting that Sandstrom claimed to have committed at 7-Eleven, that "if [Sandstrom] had better aim there would be two dead n*****s instead of one."

About a week later, the police came to Chirino's house to arrest Sandstrom. Before the police entered the house, Sandstrom hid a gun in the closet. Sandstrom's sister eventually retrieved the gun and threw it into the river. The police later recovered a .22 revolver from the river.

In late July 2005, while in custody, Sandstrom wrote a letter to one of Rios's friends. In it, Sandstrom wrote that "that b***h [Rios] better be out my hood when I

get out." Sandstrom also wrote, "[Rios] knows as much as you do I'm a killer" and that he would "beat [Rios's] a\*\*" when he saw her.

A federal grand jury returned a nine-count superseding indictment against Sandstrom and Eye. After trial, the jury found Eye guilty on Counts 1–8 and Sandstrom guilty of Counts 3–9. The jury acquitted Sandstrom on Counts 1 and 2. Thereafter, the district court sentenced Eye and Sandstrom to life imprisonment.

## II. *Discussion*

On appeal, Sandstrom and Eye argue that the district court (1) abused its discretion in denying their motions to sever because their defenses were mutually antagonistic and irreconcilable, resulting in an unfair trial; (2) erred in failing to dismiss multiplicitous counts in the indictment; (3) erred in denying their motions to dismiss Counts 1, 3, and 5 on the grounds that 18 U.S.C. § 245 is an unconstitutional exercise of Congress's Commerce Clause power; and (4) abused its discretion in denying their motions for a mistrial based on the prosecutor's alleged comments about their failure to testify. Additionally, Eye argues that (1) the evidence is insufficient to support his convictions on Counts 1 and 2 and (2) the district court erred in failing to grant his request for a mistrial and severance, in violation of his Sixth Amendment right to confrontation.

## A. *Motion To Sever*

Both Sandstrom and Eye assert that the district court abused its discretion in denying their motions to sever based on mutually antagonistic defenses. In addition, Eye contends that the district court abused its discretion in denying his motion to sever based on a Confrontation Clause violation.

"We will not reverse a denial of a motion to sever unless the appellant demonstrates an abuse of discretion resulting in clear prejudice." *United States v. Lewis*, 557 F.3d 601, 609 (8th Cir. 2009) (internal quotations and citation omitted).

## 1. *Mutually Antagonistic Defenses*

Sandstrom contends that his defense and Eye's defense were mutually antagonistic and irreconcilable. Sandstrom's defense contended that Eye shot McCay and that Sandstrom did not know that Eye was going to kill McCay. Sandstrom asserted that he had no intent to kill McCay or assist Eye in doing so and did not act with a racial motive. Sandstrom represents Eye's defense as completely contradictory because Eye contends that Sandstrom—not Eye—shot McCay at 9th Street and Brighton Avenue. According to Eye, no one fired a shot at 9th Street and Spruce Avenue. Eye accused Sandstrom of shooting McCay while Eye fought McCay at 9th Street and Brighton Avenue. Sandstrom maintains that if the jury believed the core of Eye's defense—Sandstrom was the shooter—then it would be impossible for the jury to acquit Sandstrom on Counts 3–6. Sandstrom avers that the jury had to reject Sandstrom's defense to accept Eye's defense.

Eye also argues that his defense and Sandstrom's defense were mutually antagonistic and irreconcilable. According to Eye, his defense was that (1) the first shooting at 9th Street and Spruce Avenue never occurred and was a fabrication by Rios; (2) finding McCay at 9th Street and Brighton Avenue was a chance encounter; and (3) Eye got in a fight with McCay in the middle of the street and either Rios or Sandstrom shot McCay without warning at 9th Street and Brighton Avenue. Eye characterizes Sandstrom's defense as arguing that Eye fired at McCay at 9th Street and Spruce Avenue without Sandstrom's knowledge and that Eye shot McCay at 9th Street and Brighton Avenue to keep McCay from testifying.

The government responds to both defendants' arguments by maintaining that the district court did not abuse its discretion in denying defendants' motions to sever based on mutually antagonistic defenses. First, the government argues that defendants failed to establish that the defenses that they presented at trial were truly mutually antagonistic. In support of this argument, the government contends that the "core" of

Sandstrom's defense was that he is not a racist and that, regardless of how many shootings occurred or who the victim was, he was unaware that the shootings were going to occur. The "core" of Eye's defense was that he is not a racist and that, regardless of how many shootings occurred, he was not the shooter. The government thus argues that Sandstrom denied prior knowledge of the shootings, whereas Eye denied participation in the shootings, and both denied being motivated by race. As a result, according to the government, neither the core of Sandstrom's defense nor the core of Eye's defense was that the *other* defendant was the shooter or that the *other* defendant was motivated by race. Consequently, a jury could believe that Sandstrom did not have prior knowledge of the shootings without necessarily having to find Eye guilty. Likewise, a jury could believe that Eye was not the shooter without necessarily finding Sandstrom guilty. And, the jury could have believed the core of *both* defenses if it either believed the shootings were not motivated by race or concluded that Rios was the shooter.

Second, the government argues that, even assuming the defenses were mutually antagonistic and irreconcilable, defendants have failed to show that any conflict between their defenses was the *only* basis for the jury's verdict, meaning severance was not warranted. According to the government, the basis for the jury's verdict was not a conflict between defendants' respective defenses but instead a conflict between their defenses and the government's evidence, including the testimony of Rios, who witnessed the crimes charged.

Third, the government maintains that, even if severance was warranted, defendants have failed to show prejudice resulting from their joint trial, as the witnesses' testimony would have remained the same even if they were tried separately. Therefore, they cannot show that they would have fared better in separate proceedings. Additionally, the government cites the Supreme Court and this court's recognition that the risk of prejudice from a joint trial is best resolved through jury

instructions and avers that the district court provided sufficient instructions to deal with any prejudice resulting from the joint trial.

"It is entirely proper to charge two or more defendants together 'if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.'" *United States v. Bostic*, 713 F.2d 401, 402 (8th Cir. 1983) (quoting Fed. R. Crim. P. 8(b)). "This case meets that standard, and no one contends otherwise, so there is no issue of misjoinder in violation of Rule 8. The claim is, instead, that the joinder was prejudicial, and that the District Court should have granted a severance under Fed. R. Crim. P. 14." *Id*. Rule 14(a) provides that

> [i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

"Severance will be allowed upon a showing of real prejudice to an individual defendant." *Id*. at 403 (internal quotations and citation omitted). Whether to grant a motion to sever is left "to the discretion of the trial court, and a denial of severance is not grounds for reversal unless clear prejudice and an abuse of discretion are shown." *Id*. (internal quotations and citation omitted). "Prejudice must be 'real' and 'clear,'" and "[a]n abuse of discretion in refusing severance is not alone enough to justify reversal and a new trial." *Id*. Instead, the defendant must show prejudice—that there was "some appreciable chance that defendants would not have been convicted had the separate trial they wanted been granted." *Id*. That is, the defendant must show "something more than the mere fact that his chances for acquittal would have been better had he been tried separately. He must affirmatively demonstrate that the joint trial prejudiced his right to a fair trial." *United States v. Wint*, 974 F.2d 961, 966 (8th Cir. 1992) (internal quotations and citation omitted). "A defendant can show real prejudice either by showing that his defense is irreconcilable with the defense of his

codefendant . . . or that the jury will be unable to compartmentalize the evidence as it relates to separate defendants." *United States v. Shivers*, 66 F.3d 938, 940 (8th Cir. 1995) (internal quotations, alteration, and citation omitted). "The defendant carries a heavy burden in making this showing." *United States v. Swinney*, 970 F.2d 494, 500 (8th Cir. 1992).

"'Antagonistic' defenses require severance only when there is a danger that the jury will unjustifiably infer that *this conflict alone demonstrates that both are guilty*." *United States v. Delpit*, 94 F.3d 1134, 1143 (8th Cir. 1996) (internal quotations and citation omitted). In *Zafiro v. United States*, the Supreme Court considered "whether Rule 14 requires severance as a matter of law when codefendants present 'mutually antagonistic defenses.'" 506 U.S. 534, 535 (1993). The Court rejected the petitioners' argument that it adopt a bright-line rule "mandating severance whenever codefendants have conflicting defenses." *Id*. at 538. "Mutually antagonistic defenses are not prejudicial *per se*. Moreover, Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Id*. at 538–39. According to the Court, the only time a district court should grant a severance is "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id*. at 539. "Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." *Id*. The Court recognized that "[t]he risk of prejudice will vary with the facts in each case." *Id*. And it also noted that "[w]hen the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but . . . less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id*.

In *Zafiro*, the defendants also argued that, where defendants accuse one another of the crime alleged against them, the jury may conclude "that at least one of the two

-12-

must be guilty without regard to whether the Government has proved its case beyond a reasonable doubt." *Id*. at 540. As to this argument, the Court concluded that such a scenario did not occur in the case before it, as the "[t]he Government argued that all four petitioners were guilty and offered sufficient evidence as to all four petitioners; the jury in turn found all four petitioners guilty of various offenses." *Id*.; *see also United States v. Mason*, 982 F.2d 325, 328 (8th Cir. 1993) ("Even assuming we conclude a severance would have been appropriate for any of the reasons given by Mason . . . reversal is not required . . . [because] [t]here has been no showing . . . that the denial of severance affected the jury verdict against Mason in light of the overwhelming evidence of his guilt."); *Bostic*, 713 F.2d at 402 ("We have studied the entire record and are morally certain that the denial of severance did not affect the jury verdict against appellants. It is not that Green's testimony was unimpressive. At least one juror seems to have believed him, because the jury could not agree on a verdict as to Green . . . .The dispositive point for us is the overwhelming strength of the government's evidence, wholly apart from Green's testimony.").

Additionally, the Court pointed out that even if a risk of prejudice existed, "it is of the type that can be cured with proper instructions, and juries are presumed to follow their instructions." *Zafiro*, 506 U.S. at 540 (internal quotations and citation omitted).

Here, even if we concluded that Sandstrom's and Eye's defenses were mutually antagonistic and irreconcilable, severance is not required because "this conflict alone" will not cause the jury to "unjustifiably infer" "that both are guilty." *See Delpit*, 94 F.3d at 1143. As in *Zafiro*, the government offered sufficient evidence independent of any alleged conflict between Sandstrom's and Eye's defenses as to their guilt. In response to Sandstrom's defense that he did not know that a shooting was going to take place, the government presented Chrisp's testimony that Sandstrom held up a gun and told Chrisp that she was "about to witness a homicide." Deleon also testified that Sandstrom told him that he could "kill a n****r quick." And, according to the

testimony of Rios—who was present when the crimes occurred—Eye told Sandstrom, "if you get to do one, I get to do one" and that when he saw an African-American, it would be "on site." Rios also testified that Sandstrom gave Eye the gun, without hesitating, after Eye and Rios spotted McCay walking alone and that it was obvious what Eye was going to do with the gun. She also stated that, after the first shooting at 9th Street and Spruce Avenue, Sandstrom, Eye, and Rios decided to find McCay, and Sandstrom drove around looking for McCay after the first shooting. Sandstrom also pulled the car over to let Eye out after they found McCay at 9th Street and Brighton Avenue.

Additionally, Rios's testimony contradicted Eye's defense that only one shooting occurred (at 9th Street and Brighton Avenue) and that he was not the shooter. Rios testified that Eye shot McCay at 9th Street and Spruce Avenue and that Eye shot and killed McCay at 9th Street and Brighton Avenue. Rios's testimony was corroborated by other government witnesses who testified that Eye admitted to shooting McCay and that Sandstrom confirmed it.

Accordingly, we find that it was the government's evidence—not any perceived conflict between Sandstrom's and Eye's defense theories—that was the basis for the jury's verdicts.

Moreover, just as in *Zafiro*, the district court adequately addressed any risk of prejudice by properly instructing the jury. The district court instructed the jury that it was "to decide from the evidence whether each defendant is guilty or not guilty of the crimes charged" and that it was to consider certain evidence "only in the case against [Sandstrom], and not in the case against" Eye. Prior to deliberations, the district court reminded the jury that it must "[k]eep in mind that [it] must give separate consideration to the evidence about each individual defendant" and that "[e]ach defendant is entitled to be treated separately, and [the jury] must return a verdict for

-14-

each defendant." The district court also informed the jury that counsels' statements and arguments were not evidence.

Therefore, we hold that the district court did not abuse its discretion in denying the motions to sever on the basis of mutually antagonistic defenses.

### 2. *Alleged* Bruton *Violation*

During trial, the district court permitted Detective Matthew Williams and Detective Robert Blehm of the Kansas City, Missouri Police Department to read statements obtained from Sandstrom into the record. Prior to their testimony, the government had provided the district court and Eye with redacted statements. Eye objected to introduction of the redacted statements, arguing that the statements left the jury with little doubt that Eye was the person whose name was redacted in violation of *Bruton v. United States*, 391 U.S. 123 (1968). The district court overruled Eye's objection, convinced that appropriate jury instructions would avoid unfair prejudice.

Eye objected again before Detective Williams read the first statement to the jury. Prior to Detective Williams reading the statement, the district court gave the jury a limiting instruction, stating:

> Ladies and gentlemen of the jury, you are about to hear a summary of statements given by Defendant Steven Sandstrom. You may consider those statements only in the case against him and not in the case against Defendant Gary Eye. What that means is that you may consider Defendant Steven Sandstrom's statement in the case against him and for that purpose, rely on it as much or as little as you think proper. But you may not consider or even discuss that statement in any way when you are deciding if the government has proved beyond a reasonable doubt its case against the other defendant, Gary Eye.

Detective Williams then read the statement into evidence.

Prior to Detective Blehm reading his prepared statement into evidence, Eye again objected under *Bruton*, stating, "I do not believe that the pronouns they have put in here sufficiently point to the possibility of it being anyone other than Mr. Eye. I believe it's a Bruton violation and it would be grounds for a mistrial if we read this statement." Additionally, Eye argued:

> Again, Your Honor, I don't think the pronouns in this are neutral. For example, at the bottom of the page says, other person and Rios got out of the Intrepid. To be neutral, it should say everyone got out of the Intrepid. On the second page it says the person followed the Jeep while he drove the Intrepid and the other person lit the Intrepid on fire. I think it should say someone else lit the Intrepid on fire. These neutral pronouns are not neutral. They point directly to Mr. Eye.

The district court overruled the objection, and Detective Blehm read the statement.

Eye argues that the government's introduction through Detective Williams and Detective Blehm of Sandstrom's statements violated his rights under the Confrontation Clause, notwithstanding the district court's instruction to the jury that it could consider the confession only against Sandstrom. According to Eye, the district court failed to do an in-depth analysis of whether the sheer number of redactions, as well as the type of redactions, such as linking the word "person" to the phrase "person . . . charged with murder," made redaction meaningless and destroyed his defense. Also, he argues that the district court failed to distinguish cases in which the defendant, against whom the statement is offered, is claiming no connection to the crime as opposed to one who was clearly present but offers a different explanation as to what happened, as in Eye's case. Finally, Eye argues that Chirino's testimony "left little doubt" who was being referred to in the redacted confessions. Chirino was asked whether she discussed the murder with Sandstrom, and she said "yes." Then, when asked whether she asked Sandstrom any questions about the murder, she replied, "All he told me is that Gary [Eye] shot somebody."

-16-

In response, the government asserts that the district court properly denied Eye's motion to sever based on an alleged violation of *Bruton*. According to the government, the district court permitted the two detectives to read to the jury documents each detective composed based on statements that Sandstrom made to him. The district court instructed the jury several times that the statements could be used against Sandstrom but not against Eye. The prosecution redacted the statements to eliminate all references to Eye or replace them with neutral pronouns, so that the statements did not identify Eye by name. The government contends that this court has held that, provided that a statement by a non-testifying codefendant does not facially identify the defendant and the district court properly instructs the jury, admitting the statement does not violate the Confrontation Clause, even though other properly admitted evidence may be linked with the statement to identify the defendant.

In the alternative, the government contends that even if the district court erred in admitting the statements, the error was harmless beyond a reasonable doubt, as the evidence of Eye's guilt was overwhelming and the statements were merely cumulative of other evidence admitted at trial.

The Supreme Court's *Bruton* decision is the relevant precedent. "In *Bruton*, the Supreme Court held that the admission of a nontestifying defendant's statement [facially] inculpating a codefendant violates the codefendant's Confrontation Clause rights, notwithstanding a curative instruction." *United States v. Lewis*, 557 F.3d 601, 611 (8th Cir. 2009). Thereafter, "the Court held that there is no Confrontation Clause violation where the defendant's name and existence are excised from the statement and limiting instructions are given, even though the confession might implicate the defendant when linked to other evidence." *United States v. Williams*, 429 F.3d 767, 772–73 (8th Cir. 2005) (citing *Richardson v. Marsh*, 481 U.S. 200 (1987)). Finally, in *Gray v. Maryland*, 523 U.S. 185, 188 (1998), "the Court reversed a conviction because a nontestifying codefendant's statement was admitted after being redacted by substituting a blank or the word 'deleted' for the defendant's name." *United States v.*

*Logan*, 210 F.3d 820, 823 (8th Cir. 2000). The Court held that "notwithstanding cautionary instructions and neutral redactions, *Bruton* is violated when the fact that a statement had been redacted is so obvious as to lead the jury through ordinary inferences directly to a defendant. The *Gray* Court held that the obvious indication of alteration is directly accusatory." *Williams*, 429 F.3d at 773 (citing *Gray*, 523 U.S. at 194). To determine whether a statement violates *Bruton*, we must "look[] at whether the context is one in which the risk is too great that the jury will not or cannot follow the cautionary instruction to consider the statement solely against the declarant." *Id.* (citing *Gray*, 523 U.S. at 190–91).

In *Williams*, the defendant "argue[d] that the manner in which [his codefendant's] statement was redacted violated *Gray* because it impermissibly led the jury to infer that his name had been deleted." 429 F.3d at 773. According to the defendant,

> the repeated use of the word "someone" in the recitation of [the codefendant's] statement is awkward and so interlocked with the extensive testimony about the police surveillance of [the defendant's] travels that it was obvious to the jury that only [the defendant] could be the "someone" in [the codefendant's] statement.

*Id.* In response, the government argued "that it properly replaced the defendant's name with a neutral pronoun, which did not draw attention to the redaction and was not incriminating unless linked to the co-defendant by other trial evidence." *Id.*

Our analysis in *Williams* is instructive. In evaluating the defendant's argument, we first discussed *Logan* and contrasted it with *Gray*. *Id.* In *Logan,* "we considered the kind and degree of the redactions" in determining whether a *Bruton* violation occurred. *Id.* "We distinguished the almost invisible redaction in *Logan*, where the substitution could just as easily have been the defendant's actual words, from the obviousness of the word 'deleted' which was condemned in *Gray*." *Id.* Thereafter, we

-18-

"compared the single instance of redaction in *Logan* with the violation in *Gray*, where the word 'deleted' was repeated four times in oral testimony, and where the jury also had the written statement containing blanks where the defendant's name had been excised." *Id*. We then compared the redaction at issue with *Logan* and *Gray*, concluding, "In contrast to *Logan* and increasing ten-fold the number of redactions in *Gray*, here we count more than forty instances where [the defendant's] name was replaced with the word 'someone.'" *Id*. Considering the "kind and degree" of the redactions, we concluded that

> the redaction of [the codefendant's] statement made it obvious that a name had been redacted. The replacements *were not seamlessly woven into the narrative* as in *Logan*, and *the neutral pronoun "someone" may have lost its anonymity by sheer repetition*. It may well have been clear to the jury that the statement had obviously been redacted and that the "someone" of the statement was [the defendant]. *Gray*, 523 U.S. at 196, 118 S. Ct. 1151. As the Supreme Court held in *Gray*, this case may fall within the *Bruton* class of cases where a district[] court's repeated cautionary instructions cannot protect the defendant. *Id.* at 192, 118 S. Ct. 1151.

*Id*. at 774 (emphasis added).

Despite the noted failings of the redacted statement, we held that determining whether a *Bruton* violation occurred was unnecessary "because, assuming that a Confrontation Clause error occurred . . . the error in admitting [the codefendant's] statement was harmless beyond a reasonable doubt," as the "independent evidence" against the defendant, "including his own statement, was so overwhelming as to render any such error harmless beyond a reasonable doubt." *Id*. at 774.

In the present case, there are at least 44 redactions in Sandstrom's confessions, replacing Eye's name with "somebody," "that person," "the person," "the other person," "he," "caller," "him," and "person . . . charged with murder." As in *Williams*,

-19-

the jury may have understood that "the statement had obviously been redacted" and that the neutral words actually referred to Eye. *See id*. at 774. For example, one of the redacted statements makes an express reference to "person . . . charged with murder," which obviously references Eye. And Rios—the other person in the car with Sandstrom and Eye when the alleged shootings occurred—was called by name in the redacted confession, leaving Eye as the only "unnamed" person. As a result, "[t]his case may fall within the *Bruton* class of cases where a district[] court's repeated cautionary instructions cannot protect the defendant." *Id*.

Notwithstanding, as in *Williams*, even if we concluded that a Confrontation Clause error occurred, any error in admitting the redacted statements was harmless beyond a reasonable doubt.[3] Here, the government produced overwhelming evidence of Eye's guilt. First, Rios, an eyewitness to both shootings, provided testimony directly implicating Eye. Her testimony was independent of the redacted statements. Second, other witnesses corroborated Rios's testimony. Chirino testified that Eye was "bragging" about killing a "n****r" and that she heard Eye say that McCay "was walking in my hood on my time so I smoked his a**." Stephanie Sandstrom, Sandstrom's sister, testified that Eye said that he "shot a n****r on 9th Street" and that McCay "was walking on his block on his time." Also, Deleon testified that Eye bragged, "Did you think this was a game? I told you, I killed some n****r." Sandstrom then said, "That's where [Eye] shot that n****r." Eye started laughing and said, "[H]ere, n****r, n****r, n****r." Deleon also testified that Eye told him that he and Sandstrom had been playing a game called "n****r, n****r, n****r." Deleon described the game as "kill[ing] black people."

---

[3]*See also* Part II.D (discussing the sufficiency of the evidence as to Eye's convictions on Counts 1 and 2).

"Thus, we are convinced that [Eye's] conviction cannot be attributed to [Sandstrom's] statement." *Williams*, 429 F.3d at 774 (internal quotations and citation omitted). The district court did not err in denying Eye's motion to sever.

## B. *Multiplicitous Counts*

Prior to trial, Sandstrom moved to dismiss Counts 1 through 6 of the indictment, arguing that the indictment improperly subjected him to multiple punishments for the same offense. Eye filed a motion to dismiss Counts 2, 4, and 6, arguing that he would be subjected to multiple punishments based on a single predicate offense arising out of one transaction. Eye also argued that the district court should require the government to elect between Counts 1, 3, and 5 prior to submission to the jury. The district court denied both defendants' motions.

Sandstrom and Eye then moved to dismiss Counts 1, 3, and 5, asserting that Congress lacked the authority to enact 18 U.S.C. § 245 under the Commerce Clause or the Thirteenth Amendment. The district court denied that motion as well.

On appeal, defendants argue that their indictment was impermissibly multiplicitous and that the legislative history of 18 U.S.C. §§ 245 and 924 does not manifest congressional intent to break the single course of conduct into six separate offenses. Therefore, they maintain that the district court erred in denying their motions to dismiss multiplicitous counts.

### 1. *Counts 1 and 3*

Defendants argue that Counts 1 and 3 are multiplicitous because neither the express statutory language nor the legislative history of § 245(b) sets forth the intended unit of prosecution with clarity; therefore, absent a clearly articulated congressional intent, a court should refrain from turning a single criminal episode into

multiple offenses.[4] Eye and Sandstrom aver that we must apply the rule of lenity because Congress did not declare the unit of prosecution in § 245(b). According to defendants, the shootings at 9th Street and Spruce Avenue and at 9th Street and Brighton Avenue were one course of conduct despite occurring at two locations. McCay's use and enjoyment of public streets was an ongoing event, and there were no separate, discrete interferences with his use of the street. They maintain that the government's decision to break the course of conduct into two discrete offenses is erroneous. They maintain that two volleys of gunfire separated by a short distance and a short period time is not enough to create two crimes under the express statutory language or the legislative history of § 245.

In response, the government argues that the plain language of § 245 punishes any person who "willfully injures, intimidates or interferes with" a victim's participation in or enjoyment of a federally-protected activity because of that victim's race (or other protected characteristic). 18 U.S.C. § 245(b)(2)(B). Based on this language, the government contends that the statute unambiguously targets for prosecution the act of injury, intimidation, or interference. According to the government, if, as here, a defendant engages in more than one act of injury, intimidation, or interference, then multiple prosecutions are permitted under the plain language of the statute.

In the alternative, the government contends that even if Congress intended for § 245(b)(2)(B) to be prosecuted as a course-of-conduct offense, the district court did not err in refusing to dismiss Counts 1 and 3 as multiplicitous because a course-of-conduct offense may be charged in more than one count if each act arises from a separate thought, purpose, or action or impulse. According to the government, defendants engaged in two separate and distinct attacks against McCay; these attacks

---

[4]Even though Sandstrom argues that Counts 1 and 3 are multiplicitous, we note that he was acquitted on Count 1.

were not uninterrupted. Time, space and motive separated two distinct homicidal acts. The first attack took place at the intersection of 9th Street and Spruce Avenue around 6 a.m. The second attack took place approximately ten minutes later and nearly half a mile away. Moreover, a separate and distinct impulse preceded each attack, as Sandstrom and Eye initially targeted McCay after bragging that they would "kill a n****r quick" and after seeing him for the first time near 9th Street and Spruce Avenue. After the first attack, they drove around the block and returned to the alley to confirm that McCay was dead. Eye "started freaking out" when they could not find McCay; they then discussed what they should do next. Defendants then drove around looking for McCay so that they could "finish him off since [Eye] already shot him."

Counts 1[5] and 3[6] charge defendants with violating 18 U.S.C. § 245(b)(2)(B), which provides, in relevant part, that

[5]Count 1 of the indictment provides:

On or about March 9, 2005, in Kansas City, Jackson County, in the Western District of Missouri, defendants, GARY EYE and STEVEN SANDSTROM, while aiding and abetting one another, did willfully, by force and threat of force, attempt to injure, intimate and interfere with William McCay, an African-American man, by shooting at him with a firearm, because of William McCay's race and color, and because he was and had been enjoying a facility provided and administered by a subdivision of the State of Missouri, namely, the public streets provided and administered by the City of Kansas City, in and around 9th Street and Spruce Avenue. The commission of this offense included the use of a dangerous weapon.

All in violation of Title 18, United States Code, Section 245(b)(2)(B) and Section 2.

[6]Count 3 of the indictment provides:

On or about March 9, 2005, in Kansas City, Jackson County, in the Western District of Missouri, defendants, GARY EYE and STEVEN SANDSTROM, while aiding and abetting one another, did willfully, by force and threat of force, injure, intimidate and interfere with William McCay, an African-American man, by shooting him with a firearm, because of William McCay's race and color, and because he was and had been enjoying a facility provided and administered by a subdivision of the State of Missouri, namely, the public streets provided and administered by the City of Kansas City, in and around 9th Street and Brighton Avenue. The commission of this offense included the use of a dangerous weapon and resulted in the death of William McCay.

All in violation of Title 18, United States Code, Section 245(b)(2)(B) and Section 2.

(b) [w]hoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with . . .

> (2) any person because of his race, color, religion or national origin and because he is or has been . . .

>> (B) participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof

shall be punished in accordance with the statute. Section 245(b)(5) provides that "if death results from the acts committed in violation of [§ 245,]" a defendant shall be "imprisoned for any term of years or for life," "or may be sentenced to death." Using a public facility is one of several federally-protected activities covered from interference in § 245(b)(2).

"An indictment is multiplicitous if it charges the same crime in two counts." *United States v. Chipps*, 410 F.3d 438, 447 (8th Cir. 2005). A multiplicitous indictment is impermissible because "the jury can convict the defendant on both counts, subjecting the defendant to two punishments for the same crime in violation of the double-jeopardy clause of the fifth amendment." *Id*. When a defendant is charged twice for the same statutory violation, "the question is whether Congress intended the facts underlying each count to make up a separate unit of prosecution. The unit of prosecution is the aspect of criminal activity that Congress intended to punish." *Id*. at 447–48 (internal citations omitted).

> To determine whether this indictment is multiplicitous, we must decide whether Congress intended to punish [interference with federally-protected activities] as a course of conduct, such that the first bit of [interference] conduct (which took place [at 9th and Spruce around 6 a.m]) is of a piece with the second bit (which took place [at 9th and

Brighton ten minutes later]), or whether Congress sought to punish separately individual acts within an . . . episode. We look to the statutory language, legislative history, and statutory scheme to ascertain what Congress intended the unit of prosecution to be. When Congress fails to establish the unit of prosecution clearly and without ambiguity, we resolve doubt as to congressional intent in favor of lenity for the defendant.

*Id.* at 448 (internal quotations and citations omitted).

In the present case, we need not definitively determine whether Congress intended to punish interference with federally-protected activities as a course-of-conduct offense or whether Congress sought to punish each act in a defendant's criminal episode. Even if we assume that Congress intended for § 245(b)(2)(B) to be prosecuted as a course-of-conduct offense, the district court did not err in denying the motions to dismiss Counts 1 and 3 as multiplicitous.

"To determine how many courses of conduct [Sandstrom and Eye] undertook, we apply the so-called 'impulse test.'" *Id.* at 449. Applying this test, "we treat as one offense all violations that arise from that singleness of thought, purpose or action, which may be deemed a single impulse." *Id.* (internal quotations, alteration, and citation omitted). If an attack is "uninterrupted," then we will "discern a single impulse." *Id.*

Here, the two attacks on McCay were not "uninterrupted." Instead, they were separated by both time and location. The first attack occurred at 9th Street and Spruce Avenue at 6:00 a.m. The second attack occurred at 9th Street and Brighton Avenue approximately ten minutes later.[7]

---

[7]The individual who reported the second shooting called 911 at 6:12 a.m. The caller placed the call approximately one minute after hearing the shots.

Moreover, the two attacks did not arise from a "singleness of thought, purpose or action." *See id*. at 449. Initially, the first attack was based on Eye's desire to shoot at an African American, as Sandstrom advised Eye that he had previously done. Eye commented to Sandstrom that "if you get to do one, I get to do one." While driving to pick up Chrisp, Eye told Sandstrom that when he saw an African American "it's on site," meaning that when Eye saw a black person, there would be a problem. After picking up Chrisp, Sandstrom informed Chrisp that she was "about to witness a homicide." Rios testified that Eye followed through with his desire to shoot an African American when Eye spotted McCay at 9th Street and Spruce Avenue, told Sandstrom to hand him the gun and turn down the alley, and fired approximately two shots at McCay.

In contrast, Sandstrom, Eye, and Rios initiated the second attack to prevent McCay from reporting the first shooting to avoid prosecution. According to Rios, once Eye discovered that McCay was no longer on 9th Street, he "started freaking out" and became "frantic" because McCay was no longer there. A discussion ensued in which Rios told Sandstrom to find McCay because McCay "was a case that we would probably catch," so they "needed to find him." Rios informed Sandstrom and Eye that McCay was a "witness" that they needed to "finish off" so that they would not get in trouble.

Given the multiple purposes of their separate acts at different times and locations, we hold that the district court did not err in refusing to dismiss either Count 1 or Count 3.

### 2. *Counts 3 and 5*

As discussed *supra*, Count 3 charged defendants with violating § 245(b)(2)(B) for shooting McCay, resulting in his death, at 9th Street and Brighton Avenue because

of his race and because he was enjoying the public streets. Count 5[8] charged that the same conduct also violates 18 U.S.C. §§ 1512(a)(1)(C) and (A)(3)(A)—killing McCay to prevent him from reporting to law enforcement that Sandstrom and Eye interfered with his right to enjoy the public streets.

Defendants assert that the elements of the offense charged in Count 3 are a subset of the elements of the offense charged in Count 5; in other words, Count 3 does not require proof of a fact which Count 5 does not require. According to Sandstrom and Eye, as to Count 5, the government had to prove that defendants, while aiding and abetting one another, knowingly killed McCay with the intent to prevent McCay from communicating to a law enforcement officer information related to the commission or possible commission of a "federal offense." In order for the conduct charged in Count 3 to rise to the level of a "federal offense," the shooting of McCay had to have

---

[8]Count 5 provides;

> On or about March 9, 2005, in the Western District of Missouri, the defendants, GARY EYE and STEVEN SANDSTROM, while aiding and abetting one another, did knowingly kill William McCay with the intent to prevent William McCay from communicating to a law enforcement officer of the United States information related to the commission or possible commission of a federal offense, that is, the interference with his free exercise and enjoyment of a right secured to him by the laws and the Constitution of the United States, namely, his right to the use and enjoyment of a public facility, the public streets provided and administered by the City of Kansas City, Missouri, free from intimidation based upon race and color. The death of William McCay involved circumstances constituting murder as defined in Title 18, United States Code, Section 1111, in that defendants GARY EYE and STEVEN SANDSTROM unlawfully killed William McCay willfully, deliberately, and with premeditation and aforethought.

> All in violation of Title 18, United States Code, Section 1512(a)(1)(C), (a)(3)(A) and Section 2.

-28-

been committed because of McCay's race and because he was enjoying the use of public streets. Thus, those motivational elements of Count 3 were also included in the proof required for a conviction on Count 5. Defendants assert that if those motivational factors were not present, then they did not kill McCay with the intent to prevent him from communicating information related to the commission or possible commission of a federal offense.

In response, the government argues that the district court correctly concluded that Counts 3 and 5 were not multiplicitous even though both counts arose from the second attack on McCay. According to the government, a single act may give rise to two separate charges. And, Counts 3 and 5 were not multiplicitous because they each required proof of an element that was not required to prove the other.

"The Double Jeopardy Clause is violated in a single proceeding only where multiple punishments are imposed for the same crime contrary to the legislature's intent." *United States v. Gamboa*, 439 F.3d 796, 809 (8th Cir. 2006) (internal quotations, alterations, and citations omitted). We apply the *Blockburger* test "to determine whether two crimes are the same for double jeopardy purposes." *Id*. (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). The *Blockburger* test provides that "if each offense requires proof of an element not required by the other, the crimes are not considered the same, and a double jeopardy challenge necessarily fails." *Id*. (internal quotations, alteration, and citation omitted). "We have recognized that the *Blockburger* test focuses on the statutory elements of the offenses, rather than the evidence presented at trial." *Id*. (internal quotations and citations omitted). To properly analyze a Double Jeopardy claim, we must "examine not only the statutory provisions at issue, but also the specific charges brought against the defendant in the indictment." *Id*.

In applying the *Blockburger* test, we must also ensure that one offense is not a "lesser included offense" of the other. *See Rutledge v. United States*, 517 U.S. 292,

306–07 (1996) (holding that because a drug conspiracy violation is a lesser included offense of a continuing criminal enterprise violation, a defendant may not be convicted of both offenses). That is, we must determine whether *both* offenses "require[] proof of any element that is not a part of the [other] offense." *Id.* at 298. A "lesser included offense" is "[a] crime that is composed of some, but not all, of the elements of a more serious crime and that is necessarily committed in carrying out the greater crime." Black's Law Dictionary 1109 (7th ed. 1999). "For double-jeopardy purposes, a lesser included offense is considered the 'same offense' as the greater offense, so that acquittal or conviction of either offense precludes a separate trial for the other." *Id.*

Here, Count 3 charged defendants with violating § 245(b)(2)(B). To establish a violation of § 245(b)(2)(B), the government had to prove that the defendants (1) used "force or threat of force"; (2) acted to "willfully injure[], intimidate[], or interfere[] with" McCay (or attempted to do so); (3) acted because of McCay's race; and (4) acted because McCay was enjoying the public streets of Kansas City, Missouri. 18 U.S.C. § 245(b)(2)(B); *see also United States v. Nelson*, 277 F.3d 164, 185–86 (2d Cir. 2002) ("Likewise, in the case at bar, similar constitutional shoals can be avoided by giving full effect to the congressional purpose behind § 245(b)(2)(B)—by requiring, in other words, as elements of the crime defined by § 245(b)(2)(B) that the forceful injury, intimidation, or interference that the statute addresses be committed 'because' of the victim's race or religion, etc., and 'because' the victim was participating in or enjoying a facility, etc., provided or administered by a State or a subdivision thereof.").

Count 5 charged defendants with witness tampering, in violation of § 1512(a)(1)(C) and (a)(3)(A).[9] Section 1512(a)(1)(C) provides that

---

[9]Section 1512(a)(3)(A) provides that the punishment for a violation of § 1512(a)(1)(C) "in the case of a killing" is the death penalty or life imprisonment.

> [w]hoever kills or attempts to kill another person, with intent to . . . prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings . . . shall be punished as provided in paragraph (3).

To prove that each defendant violated § 1512(a)(1)(C), the government had to establish that

> "(1) the defendant killed or attempted to kill a person; (2) the defendant was motivated by a desire to prevent the communication between any person and law enforcement authorities concerning the commission or possible commission of an offense; (3) that offense was actually a federal offense; and (4) the defendant believed that the person in (2) above might communicate with the federal authorities."

*United States v. Rodriguez-Marrero*, 390 F.3d 1, 13 (1st Cir. 2004) (quoting *United States v. Stansfield*, 101 F.3d 909, 918 (3d Cir. 1996)).

Applying the *Blockburger* test, Count 3 required the government to prove elements that it was *not* required to prove under Count 5: (1) that Sandstrom and Eye acted because of McCay's race and (2) that Sandstrom and Eye acted because McCay was enjoying a federally-protected activity. 18 U.S.C. § 245(b)(2)(B). Conversely, Count 5 required the government to prove an element that it is not required to prove under Count 3: that the defendants acted to prevent McCay from communicating with law enforcement authorities about the possible commission of a federal offense. 18 U.S.C. § 1512(a)(1)(C). And, because Count 5—witness tampering—required the government to prove at least one element *different from* Count 3—interference with federally-protected activities—it is not a lesser included offense of Count 3.

-31-

Accordingly, the district court did not err in declining to dismiss either Count 3 or Count 5.

### 3. *Counts 2 and 4*

Counts 2 and 4 charged defendants with firearms violations. Count 2[10] charged them with using a firearm during the commission of a violent crime—the first shooting at 9th Street and Spruce Avenue—in violation of 18 U.S.C. § 924(c)(1)(A)(iii). Count 4[11] charged them with using a firearm during the

_____

[10]Count 2 provides:

On or about March 9, 2005, in Kansas City, Jackson County, in the Western District of Missouri, defendants, GARY EYE and STEVEN SANDSTROM, while aiding and abetting one another, knowingly used, carried, and discharged; and caused to be used, carried, and discharged, a firearm, namely a .22 caliber revolver, during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, that is, the offense charged in Count One of the Indictment and incorporated herein by reference.

All in violation of Title 18, United States Code, Section 924(c)(1)(A)(iii) and Section 2.

[11]Count 4 provides:

On or about March 9, 2005, in Kansas City, Jackson County, in the Western District of Missouri, defendants, GARY EYE and STEVEN SANDSTROM, while aiding and abetting one another, knowingly used, carried, and discharged; and caused to be used, carried, and discharged, a firearm, namely a .22 caliber revolver, during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, that is, the offense charged in Count Three of the Indictment and incorporated herein by reference. In committing this offense, defendants, GARY EYE and STEVEN SANDSTROM, caused the death of William McCay through the use and discharge of said firearm. The death of William McCay involved circumstances constituting murder as defined

commission of a violent crime—the second shooting at 9th Street and Brighton Avenue—causing McCay's death in circumstances constituting murder.

According to defendants, because Counts 1 and 3 were multiplicitous, the weapons offenses predicated on those counts—Counts 2 and 4—were also multiplicitous. They argue that both counts charged them with using a firearm during a crime of violence, with Count 4 adding that the use of the firearm resulted in McCay's death. According to defendants, this does not make Count 4 a distinct crime from Count 2 because Count 4 merely reflects a penalty enhancement permitted by § 245(b) depending on the injury suffered.

In response, the government contends that Counts 2 and 4 are not multiplicitous because it is well-settled that multiple firearms offenses may be charged in the same indictment if they are based on different predicate crimes of violence, even if the predicate crimes of violence were part of a single criminal transaction, provided that the predicate crimes of violence are not themselves multiplicitous.

Where a defendant is convicted of "two distinct underlying offenses" "during each of which he employed a firearm," then "they do not constitute a single underlying offense." *United States v. Allee*, 299 F.3d 996, 1003 (8th Cir. 2002). Thus, a defendant's argument "that the language of [§ 924(c)] does not permit two or more convictions under section 924(c) when the predicate crimes of violence arise from the same course of conduct" necessarily fails. *United States v. Rahim*, 431 F.3d 753, 757 (11th Cir. 2005).

---

in Title 18, United States Code, Section 1111, in that defendants GARY EYE and STEVEN SANDSTROM unlawfully killed William McCay willfully, deliberately, and with premeditation and malice aforethought.

All in violation of Title 18, United States Code, Section 924(c)(1)(A)(iii), (j)(1), and Section 2.

Nothing in the language of section 924(c) supports [this] view; to the contrary, section 924(c) makes it a crime to use, carry, or possess a firearm "during and in relation to *any crime of violence* . . . ." *Id.* § 924(c)(1)(A) (emphasis added). Section 924(c) has no language limiting its reach to offenses occurring in a separate "criminal transaction" or "course of conduct," and we cannot and will not read that requirement into the statute.

*Id.* (holding that § 924(c) permitted conviction of two violations arising from predicate crimes of armed bank robbery and carjacking which arose from the same course of conduct). "[S]eparate crimes do not become a single offense merely because they arise out of the same criminal episode or because the same gun is paired with each underlying offense." *United States v. Floyd*, 81 F.3d 1517, 1527 (10th Cir. 1996) (internal quotations and citation omitted).

As explained in Part II.B.1, Counts 1 and 3 are not multiplicitous and can therefore serve as separate predicate offenses supporting separate firearms offenses in Counts 2 and 4. Therefore, the district court did not err in declining to dismiss either Count 2 or Count 4.

### 4. *Counts 4 and 6*

Both Counts 4 and 6 charged defendants with using a firearm during the commission of a violent crime—the second shooting at 9th Street and Brighton Avenue resulting in McCay's death in circumstances constituting murder. Count 4 was predicated on the offense charged in Count 3—violating § 245(b)(2)(B) for shooting McCay, resulting in his death, at 9th Street and Brighton Avenue because of his race and because he was enjoying the public streets. Count 6[12] was predicated on the

---

[12]Count 6 provided:

On or about March 9, 2005, in Kansas City, Jackson County, in the Western District of Missouri, defendants, GARY EYE and STEVEN

offense charged in Count 5—violating §§ 1512(a)(1)(C) and (A)(3)(A) by killing McCay to prevent him from reporting to law enforcement that Sandstrom and Eye interfered with his right to enjoy the public streets.

Sandstrom and Eye make two arguments in support of their claim that Counts 4 and 6 are multiplicitous. First, they assert that because Counts 3 and 5 are multiplicitous, the weapons offenses predicated on those counts—Counts 4 and 6—are multiplicitous. We reject this argument based on our previous analysis in Part II.B.3.

Second, they make the alternative argument that Counts 4 and 6 are based on the exact same criminal conduct. According to the defendants, although the predicate offenses of Counts 3 and 5 were charged under different statutes, Counts 4 and 6 were charged under the same statute—§ 924(c)(1)(A)(iii). And, the criminal conduct underlying Counts 4 and 6 was the same—the shooting and killing of McCay at 9th Street and Brighton Avenue. In support of this argument, the defendants rely on *United States v. Phipps*, 319 F.3d 177, 184–85 (5th Cir. 2003), in which the Fifth

SANDSTROM, while aiding and abetting one another, knowingly used, carried, and discharged; and caused to be used, carried, and discharged, a firearm, namely a .22 caliber revolver, during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, that is, the offense charged in Count Five of the Indictment and incorporated herein by reference. In committing this offense, defendants, GARY EYE and STEVEN SANDSTROM, caused the death of William McCay through the use and discharge of said firearm. The death of William McCay involved circumstances constituting murder as defined in Title 18, United States Code, Section 1111, in that defendants GARY EYE and STEVEN SANDSTROM unlawfully killed William McCay willfully, deliberately, and with premeditation and malice aforethought.

All in violation of Title 18, United States Code, Section 924(c)(1)(A)(iii), (j)(1), and Section 2.

Circuit held that because § 924(c) did not unambiguously authorize multiple convictions for the single use of a firearm based on multiple predicate offenses, the rule of lenity applied and the defendants were entitled to dismissal of one firearm count.

In response, the government notes that *Phipps* is not binding on this court. In addition, it argues that *Phipps* was wrongly decided because the statute under which defendants were convicted unambiguously punishes any person who "uses" a firearm "during and in relation to *any* crime of violence." 18 U.S.C. § 924(c)(1) (emphasis added). According to the government, regardless of how the unit of prosecution is defined, Sandstrom and Eye used a firearm during the crime of violence charged in Count 3 and used a firearm during the crime of violence charged in Count 5. Finally, the government maintains that *Phipps* is contrary to *United States v. Lucas*, 932 F.2d 1210 (8th Cir. 1991).

"Section 924(c)(1) proscribes the carrying (or use) of '*a* firearm' during the commission of 'any crime of violence or drug trafficking crime.'" *United States v. Freisinger*, 937 F.2d 383, 388 (8th Cir. 1991) (quoting 18 U.S.C. § 924(c)(1)). "Offenses under section 924(c) are defined in terms of using or carrying firearms in relation to a drug trafficking crime or a crime of violence, not in terms of when the firearms were possessed." *Lucas*, 932 F.2d at 1221. Although we have previously held that § 924(c)(1) "authorizes prosecution for the possession of each firearm a defendant possesses during and in relation to a single crime of violence or drug trafficking crime," *Freisinger*, 937 F.2d at 390, we have never addressed whether § 924(c)(1) permits multiple convictions for the single use of a firearm based on multiple predicate offenses. Nevertheless, our prior precedent suggests that multiple underlying offenses support multiple § 924(c)(1) convictions.

In *Freisinger*, the defendant argued that § 924(c)(1) did not permit "multiple convictions for carrying more than one firearm during the course of one drug

trafficking offense." *Id.* at 388. In response, the government asserted "that the multiple convictions are permissible under the statute." *Id.* We observed that "[t]he question of how many convictions can lawfully be obtained under these circumstances is a question of the appropriate unit of prosecution, and that is a question of legislative intent." *Id.* We held that the "unit of prosecution" with regard to § 924(c)(1) was not ambiguous because the statute "preface[d] the object of the offense by the word 'a.'" *Id.* at 389.

After finding that the unit of prosecution was unambiguous, we discussed the Sixth Circuit's holding "that separate section 924(c)(1) convictions may be obtained where there are multiple drug trafficking crimes or multiple crimes of violence, but 'not . . . because more than one gun was involved.'" *Id.* (quoting *United States v. Henry*, 878 F.2d 937, 942 (6th Cir. 1989)). The defendant in *Henry* "committed two drug trafficking crimes with three firearms," and "[t]he government included two section 924(c)(1) counts in the indictment." *Id.* "Each of the two gun counts in the indictment referred to both of the drug trafficking offenses, rather than predicating separate section 924(c)(1) charges on the separate underlying drug trafficking offenses." *Id.* The Sixth Circuit determined that "the government *could* have charged more than one section 924(c)(1) violation, but only by basing each count on a different drug trafficking offense." *Id.* (citing *Henry*, 878 F.2d at 942–44). We rejected the Sixth Circuit's conclusion in *Henry* that "multiple section 924(c)(1) offenses *must* be supported by multiple underlying offenses," *id.*; however, we *never* suggested that multiple § 924(c)(1) offenses *could not* be supported by multiple predicate offenses. *See id.*

In fact, we acknowledged in dicta the potential permissibility of multiple convictions for the single use of a firearm based on multiple predicate offenses in *Freisinger* when we discussed the Tenth Circuit's decision in *United States v. Chalan*, 812 F.2d 1302 (10th Cir. 1987). *Id.* at 389, 390. We explained:

In *Chalan* the court held that felony murder and robbery (where the robbery was the felony supporting the felony murder charge) were but a single crime of violence; thus, even if multiple underlying offenses would support multiple section 924(c)(1) convictions—a question which the court did not have to decide—multiple section 924(c)(1) convictions were not proper in that case because there were not multiple underlying offenses.

*Id.* at 389. In a footnote, we observed that "[n]othing in *Chalan* suggests that more than one firearm was involved. *Id.* Thereafter, we concluded that *Chalan* did not support a holding that only a single violation of § 924(c)(1) occurs when a defendant commits one drug trafficking offense involving more than one firearm, stating:

As previously noted, in *Chalan* the court found that the multiple underlying offenses—felony murder and robbery—were but a single offense. By holding that only one crime of violence occurred, *the court eliminated the only arguable basis for multiple section 924(c)(1) convictions in that case, because only one firearm was involved*.

* * *

*Since only one firearm was involved and only one crime of violence occurred, there was simply no legal basis for more than one section 924(c)(1) conviction*. Obviously, under such circumstances multiple section 924(c)(1) convictions would constitute double jeopardy.

*Id.* at 390, 390 n.7 (emphasis added).

Following *Freisinger*, we explained that "[w]hat distinguishes one offense from another and gives them separate legal identities is the 'use' attributed to the firearm: each separate use of a firearm constitutes a separate offense, even where there is only one predicate drug-trafficking crime." *United States v. Canterbury*, 2 F.3d 305, 306 (8th Cir. 1993).

Here, there is a "legal basis" for more than one § 924(c)(1) conviction because one firearm was used to commit two different offenses—Sandstrom and Eye used the firearm during the commission of a crime of violence charged in Count 3 and also used the firearm during the commission of a crime of violence charged in Count 5. *See Freisinger*, 937 F.2d at 390. Counts 4 and 6 are distinguishable from one another because the defendants "used" the firearm at issue in both counts to commit separate offenses, even though the offenses occurred simultaneously. *See Cantebury*, 2 F.3d at 306.

Therefore, we hold that the district court did not err in refusing to dismiss either Count 4 or Count 6 as multiplicitous.[13]

## C. *Constitutionality of 18 U.S.C. § 245*

Defendants challenge the constitutionality of § 245, arguing that Congress lacked the authority to enact it pursuant to its Commerce Clause powers, the Thirteenth Amendment, the Fourteenth Amendment, or the Fifteenth Amendment.

In response, the government argues that the district court properly rejected defendants' challenges to the constitutionality of § 245 because Congress acted well

---

[13]Our interpretation of our circuit precedent is in accord with the decisions of our sister circuits. "The Third, Sixth, and Tenth Circuits have upheld multiple section 924(c) convictions where the same predicate crimes of violence, bank robbery and carjacking, occurred 'virtually simultaneously.'" *Rahim*, 431 F.3d at 758 (citing *United States v. Casiano*, 113 F.3d 420, 425 (3d Cir. 1997); *United States v. Burnette*, 170 F.3d 567, 571–72 (6th Cir. 1999); *United States v. Romero*, 122 F.3d 1334, 1343–44 (10th Cir. 1997)). *But see Phipps*, 319 F.3d at 184–85 (holding that § 924(c) did not unambiguously authorize multiple convictions for single use of single firearm based on multiple predicate offenses, and thus, under rule of lenity, defendants, who used single firearm a single time to commit dual offenses of kidnaping and carjacking, were entitled to dismissal of one firearm count; unit of prosecution under statute was combination of predicate offense and use, carriage, or possession of firearm, and not either predicate offense alone or mere use, carriage, or possession).

within its authority under both § 2 of the Thirteenth Amendment and under the Commerce Clause in enacting the statute. The government represents that every court to have considered the issue—including this court—has upheld the constitutionality of the statute.

The government is correct. We have already held that § 245 "is constitutional as applied under the thirteenth amendment." *United States v. Bledsoe*, 728 F.2d 1094, 1097 (8th Cir. 1984). In *Bledsoe*, we explained that the Thirteenth Amendment permits Congress to "reach purely private action" and there could be no "doubt that interfering with a person's use of a public park because he is black is a badge of slavery." *Id.*; *see also United States v. Nelson*, 277 F.3d 164, 190–91 (2d Cir. 2002) ("On the basis of the foregoing analysis, we similarly conclude that § 245(b)(2)(B)'s prohibition against private violence motivated by the victim's race, religion, etc., *and* because of the victim's use of a public facility, etc., falls comfortably within Congress's power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation.") (internal quotations, alterations, and citation omitted); *United States v. Allen*, 341 F.3d 870, 884 (9th Cir. 2003) ("We agree with the Second and Eighth Circuits, for the reasons set forth in their well-reasoned opinions, that the enactment of § 245(b)(2)(B) was a constitutional exercise of Congress's authority under the Thirteenth Amendment.").

Because we hold that § 245 is a valid exercise of Congress's power under the Thirteenth Amendment, we need not address the remaining constitutional challenges to § 245. *See Nelson*, 277 F.3d at 174–75 ("Because the government no longer presents the Fourteenth Amendment argument, and because we conclude that this argument is not necessary to sustaining the constitutionality of § 245(b)(2)(B) as applied in this case, we decline to address it. Similarly, because we determine that the Commerce Clause argument is also unnecessary to the constitutionality of this statute as here applied, we set it to one side as well. We arrive at these conclusions because

we believe that § 245(b)(2)(B) falls comfortably within Congress's powers under the Thirteenth Amendment as that Amendment has authoritatively been interpreted.").

D. *Prosecutor's Comments*

Sandstrom and Eye also challenge comments that the prosecutor made during closing argument, arguing that the prosecutor improperly shifted the burden of proof. During closing argument, the prosecutor discussed some of the jury instructions with the jury "to explore some of what [he] expect[ed] the defense to say" and to obtain "a clear understanding of what it is that the government is required to prove." The prosecutor then discussed the jury instructions regarding Counts 1 and 3, stating:

> Now, ladies and gentlemen, it is important to remember that the law, our law protects us all from us all. Counts 1 and 3 are not about racism. Counts 1 and 3 do not require the government to prove that anyone is racist. No one's views, no matter how repugnant they may be, subject one to a criminal trial in the United States of America.
>
> What Instruction 24, regarding the shooting at 9th and Spruce, and Instruction 25, regarding the shooting at 9th and Brighton require is that the government demonstrate that William McCay was selected because of his race. We, as a country, have decided that we will not tolerate selecting a fellow human being for violence, for death, simply because of the pigment of his skin or the accident of his birth.
>
> Nowhere in that instruction does it require the government to demonstrate or satisfy to anyone that these two individuals are racists. *But, ladies and gentlemen, if not race, why?* There is not a shred of evidence that either of these two individuals knew William McCay before they laid eyes on him on March 9th of 2005. Not a shred of evidence. No relationship, no grudge, no dispute, no exchange of words of any kind or any prior relationship whatsoever. *If not race, why?*
>
> Well, the defendant's own words. Gary Eye. You do one, I do one.
>
> Gary Eye. I smoked that n***r.

-41-

Gary Eye. N***r was in my hood on my time. My hood on my time. So I smoked his ass.

Steven Sandstrom in the car with Vincent Deleon as they drive past the crime scene the same day of the murder, that's where Gary shot that n****r.

Circumstantial evidence of intent, corroboration is reflected in the words and the deeds and the vocabulary. And, ladies and gentlemen, I, again, submit to you, if not race, why? *Not a single alternative motive has been supplied.*

(Emphasis added.)

Both Sandstrom and Eye objected to the prosecutor's statements, arguing that the prosecutor shifted the burden of proof. In their view, the prosecutor's statements alluding to the absence of any alternative to race as a motive for the crime made the jury believe the defense had the burden to show such an alternative existed. Defendants maintained that this was constitutional error. In response, the prosecutor stated that it was not a comment about the defendants' failure to testify. The district court overruled the objection, and defendants moved for a mistrial. The district court denied the motion. No curative instruction was requested or given.

On appeal, defendants argue that the prosecutor improperly asserted to the jury that the defense failed to provide the jury with any motive other than race. They maintain that they were the only persons who could testify as to their motive, or lack thereof. According to defendants, the prosecutor's argument was an improper comment on their Fifth Amendment right to remain silent, and it improperly shifted the burden of proof to the defense; as a result, the district court abused its discretion in denying their request for a mistrial based on the prosecutor's argument.

In response, the government argues that the district court did not abuse its discretion in denying defendants' motions for a mistrial based on the prosecutor's closing argument. It asserts that the prosecutor's indirect comment did not demonstrate an intent by the prosecutor to draw attention to the defendants' silence, nor would a jury naturally and necessarily understand the comment as highlighting defendants' failure to testify. According to the government, the prosecutor made the comment as he was explaining to the jury what the government must establish to prove a violation of § 245(b)(2)(B), and it was a permissible comment on defense counsels' failure to counter the evidence represented by the government. In the alternative, the government argues that even if the comment was improper, the district court did not abuse its discretion in denying defendants' motions for mistrial because they were not unfairly prejudiced by the isolated comment. The government maintains that it provided overwhelming evidence of the defendants' guilt and that the district court provided sufficient instructions to the jury regarding the government's burden of proof and the defendants' right not to testify. Therefore, the government argues that Sandstrom and Eye were not deprived of a fair trial.

"It is well established that the Fifth Amendment forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *United States v. Gardner*, 396 F.3d 987, 988 (8th Cir. 2005) (internal quotations, alterations, and citation omitted). A defendant must establish that "a prosecutor's comment was both improper and prejudicial to the defendant's substantial rights" to obtain a new trial. *Id*. We "review[] *de novo* whether the prosecutor has unconstitutionally commented on the defendant's failure to testify." *Id*. We then review for an abuse of discretion a district court's denial of a motion for a new trial. *Id*. at 989.

Because the prosecutor in the present case "neither directly commented on the defendant[s'] silence, nor demonstrated an intent to draw attention to that silence," we must determine "whether 'the jury would *naturally and necessarily* understand the

-43-

comments as highlighting the defendant[s'] failure to testify.'" *Id.* (quoting *Herrin v. United States*, 349 F.3d 544, 546 (8th Cir. 2003)) (emphasis added in *Gardner*), "Comments must be evaluated in the context of the entire closing arguments and the evidence introduced at trial." *Id.* A court should not take "too narrow a view of both the comment and the evidence" because "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Id.* at 992 (internal quotations and citation omitted).

In general, the government is permitted to "comment on the failure of the defense, as opposed to the defendant, to counter or explain the evidence unless the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Id.* at 991 (internal quotations, alteration, and citation omitted) (holding that no basis existed "for inferring that the jury would naturally and necessarily construe a reference to no evidence 'from the defense' as an indirect comment on [the defendant's] failure to testify."). And, although a prosecutor's comment during closing argument "that the government's evidence was unrefuted, uncontradicted, or unexplained may constitute an indirect comment on the defendant's failure to testify, the issue requires an analysis of the trial evidence and the context in which the comment was made." *Id.*; *see also United States v. Moore*, 129 F.3d 989, 993 (8th Cir. 1997) (holding that prosecutor's characterization of evidence as uncontroverted did not constitute prejudicial misconduct by expressing personal opinion on issue of defendant's guilt and calling attention to defendant's failure to testify, as characterization of evidence simply referred to strength and clarity of government's evidence); *United States v. Emmert*, 9 F.3d 699, 702 (8th Cir. 1993) (holding that prosecutor did not improperly comment on defendant's failure to testify by stating during rebuttal summation that there was "no evidence," "no testimony," and "no explanation" to counter government's theory that telephone calls to defendant were placed in connection with motorcycle business rather than with drug conspiracy; comments were made in response to closing arguments of defendant's counsel that

defendant operated legitimate business, and did not manifest intention by prosecutor to call attention to defendant's failure to testify).

This type of remark "is improper only when the jury would naturally and necessarily take it as a comment on the defendant's failure to testify because no one other than the defendant could have refuted the evidence in question." *Gardner*, 396 F.3d at 992. "[T]he question is not whether the jury possibly or even probably would view the challenged remark in this manner, but whether the jury *necessarily* would have done so." *Id*. (internal quotations and citation omitted). For example, "a prosecutor may not comment on a defendant's failure to present evidence to contradict the government's case if *the defendant alone* had the information to do so." *United States v. Triplett*, 195 F.3d 990, 995 (8th Cir. 1999) (internal quotations and citations omitted) (emphasis added).

In the present case, the prosecutor's comments were not improper. We conclude that the jury would not have "naturally and necessarily" taken such comments as highlighting defendants' failure to testify. The prosecutor made the contested comments in the context of explaining the government's burden of proof with respect to Counts 1 and 3. The prosecutor correctly advised the jury that the government need not establish that Sandstrom and Eye were "racists" to prove a violation of § 245(b)(2)(B); instead, the jury could infer from the evidence, including the defendants' "intent," "words," "deeds," and "vocabulary," that they selected their victim based on his race—an essential element of a § 245(b)(2)(B) violation.

Furthermore, the prosecutor's comments that "if not race, why" and "[n]ot a single alternative motive has been supplied" were comments on the defense's failure—not the defendants' personal failure—"to counter or explain the evidence." *See Gardner*, 396 F.3d at 991. During trial, the government introduced testimony from which a jury could reasonably infer that defendants selected McCay because of his race. Rios testified that, after Sandstrom said that he "shot at a n****r at 7-Eleven,"

-45-

Eye replied that "if you get to do one, I get to do one." She also testified that Eye said that he shot McCay because "he was a n****r in my hood." Deleon testified that both Sandstrom and Eye said that they would "kill a n****r quick" and that Eye said that he and Sandstrom had been playing "n****r, n****r, n****r" when they shot McCay.

Defense counsel for Sandstrom and Eye attempted to counter this evidence. Eye's counsel stated to the jury at the beginning of trial that "Eye is not a racist and there will be no direct evidence, credible evidence to support the allegation of race in this case." Eye's counsel then cross-examined government witnesses, such as Deleon and Chirino, in an attempt to show that Eye was not motivated by race. Eye's counsel called several witnesses, including Eye's former counselor at a juvenile facility, his sister's best friend, and his sister, who testified that Eye got along with African Americans and did not, to their knowledge, use racial slurs.

Sandstrom's counsel also commented to the jury that "there is no motive, no race motive. There is no reason for a race motive. Didn't know the shooting was going to occur. If you didn't know it was going to occur, there is no intent. If there is no intent, there's no motive to make it happen." Like Eye's counsel, Sandstrom's counsel also cross-examined government witnesses, attempting to show lack of a racial motive. And, Sandstrom's own defense witnesses, such as his family, friends, a juvenile detention center employee, and Sandstrom's former probation officer, testified that Sandstrom got along with African Americans and did not, to their knowledge, use racial slurs. At the conclusion of the trial, both Sandstrom's counsel and Eye's counsel argued to the jury that the crimes were not racially motivated.

While defense counsel, through both direct and cross examination, attempted to show that Sandstrom and Eye did not act on the basis of race, the jury could have reasonably concluded that they failed to establish an alternative motive for the shootings.

Finally, the prosecutor could properly comment on defendants' failure to present evidence to contradict the government's theory of a racial motivation because Rios—in addition to defendants—was an eyewitness to the shootings and testified to the motivation for the shootings. Therefore, this is not a case in which the defendants alone possessed the necessary information to contradict the government's case. *See Triplett*, 195 F.3d at 995.

Thus, we hold that the prosecutor's comments were not improper and the district court did not abuse its discretion in denying defendants' motions for a mistrial.

### E. *Sufficiency of the Evidence—Counts 1 and 2*

Eye asserts that the evidence was insufficient to convict him on Counts 1 and 2 because it was impossible for McCay, the alleged victim, to have gone from the first location on foot to the second location in less time than it took defendants to drive there.

In response, the government argues that sufficient evidence supports Eye's convictions arising from the first shooting at 9th Street and Spruce Avenue. In support of its argument, the government relies on (1) Rios's testimony that she saw Eye shoot McCay at 9th Street and Spruce Avenue; (2) a witness who testified to hearing gunshots close to the intersection of 9th Street and Spruce Avenue; and (3) the jury's consideration and rejection of Eye's argument that McCay could not have been the victim of both the Spruce shooting and the Brighton shooting because the distance between the two shootings—less than half a mile—was too great for McCay to travel in the time that it took for the defendants to travel from one intersection to the other.

> We review de novo a district court's denial of a motion for judgment of acquittal. This court views the evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict. We will only reverse a jury's verdict where no

reasonable jury could have found the accused guilty beyond a reasonable doubt.

*United States v. McClellon*, 578 F.3d 846, 854 (8th Cir. 2009) (internal quotations, alteration, and citations omitted).

In support of his sufficiency argument on Counts 1 and 2, Eye first attacks Rios's credibility. He points out that she pleaded guilty to lying to the FBI in connection with the investigation, which was directly related to her perjury before the grand jury. Also, he notes that she provided different versions of events to the FBI. According to Eye, by the time that Rios testified at trial, her version of events conveniently conformed to the government's theory of the case.

"The credibility of a witness is for the jury to decide, and any questions regarding the credibility of [a witness] must be resolved in favor of the jury's verdict." *United States v. Papakee*, 573 F.3d 569, 575 (8th Cir. 2009). We will not disturb the jury's decision to credit Rios's version of events. According to her testimony, she was with defendants at all times during the commission of the crimes charged. She testified that they drove down the alley between 8th and 9th Streets and that when they reached the end of the alley, Eye fired at McCay with Sandstrom's gun. And, apart from Rios's testimony, another witness testified to hearing gunshots as he was entering a restaurant around 6:00 a.m., which was located no more than 80 feet from the intersection of 9th Street and Spruce Avenue. Also, Sandstrom's sister testified that Rios said, in a conversation between the witness, defendants, and Rios, that they needed to "finish [McCay] off" after Eye shot him the first time.

Eye next attacks Rios's testimony as incredible as a matter of law, arguing that even if a shooting occurred at 9th Street and Spruce Avenue, the victim was not McCay, contrary to Rios's testimony, because McCay could not have been the victim of both the Spruce shooting and Brighton shooting because of the distance between

-48-

the two shootings. According to Eye, McCay could not travel from one intersection to the other in the requisite time. In support of his argument, Eye cites an FBI agent's testimony that the distance from the alley near Spruce to the Brighton intersection is four-tenths of a mile, which is 704 yards or about seven football fields. According to Eye, to believe that McCay had just been shot at about one-half mile back up the street and was at the corner of Brighton Avenue calmly walking down the street, all before Rios, Sandstrom, and Eye arrived there in their same automobile driving on empty streets at around 6:00 a.m. frantically looking for McCay, is a physical impossibility.

"Credibility challenges are for the jury, and the test for rejecting evidence as incredible is extraordinarily stringent and is often said to bar reliance only on testimony asserting facts that are physically impossible." *United States v. Jenkins-Watts*, 574 F.3d 950, 963 (8th Cir. 2009) (internal quotations, alteration, and citations omitted).

Rios's testimony was not incredible as a matter of law. When asked whether she had a front view of McCay on 9th Street and Spruce Avenue and in what direction she was looking at him, Rios replied, "His face." And, the jury heard testimony that McCay often walked to his place of work, which was about six to eight blocks from the corner of 9th Street and Brighton Avenue; he usually arrived at work between 6 and 6:30 a.m.

But the heart of Eye's argument is his contention that because the shootings took place *two minutes apart*, it was physically impossible for McCay to walk four-tenths of a mile from Spruce Avenue to Brighton Avenue. At trial, when asked whether "[a]ll this occurred then from the initial incident back up at the 9th and Spruce location, just a matter of less than a couple of minutes," Rios replied, "That's correct." However, the government also presented evidence that could support a finding that the shootings took place more than "a couple of minutes" apart. The jury heard testimony that the shots were fired at 9th Street and Spruce Avenue around 6:00 a.m.

The 911 call following the shooting at 8th Street and Brighton Avenue was made at 6:12 a.m., and the caller testified that he made the call approximately one minute after hearing the shots fired. Thus, the jury could have concluded that the shootings occurred approximately ten minutes apart, given the time of the 911 phone call with regard to the second shooting. The jury could properly credit Rios's testimony in other respects, while declining to accept her testimony that the shootings occurred "a couple of minutes" apart. *See United States v. Close*, 518 F.3d 617, 620 (8th Cir. 2008) ("A jury is free to believe or reject a witness's testimony in part or in whole.").

We hold that sufficient evidence exists to support Eye's convictions on Counts 1 and 2.

### III. *Conclusion*
Accordingly, we affirm the judgment of the district court.

_____