IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 8, 2019 Session

## STATE OF TENNESSEE v. LADARIUS LOCKHART

**Appeal from the Criminal Court for Shelby County**
No. 15-00704      Chris Craft, Judge

_____

**No. W2018-00051-CCA-R3-CD**

_____

The Defendant, Ladarius Lockhart, was convicted of two counts of rape. The trial court merged the convictions and imposed a nine-year sentence. On appeal, the Defendant contends that the evidence is insufficient to support the convictions and that the prosecutor made improper statements during closing arguments. Upon reviewing the record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Larry Fitzgerald (at trial) and Melody M. Dougherty (on appeal), Memphis, Tennessee, for the Appellant, Ladarius Lockhart.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Joshua Corman, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

The Defendant was convicted of raping the intoxicated victim during the early morning hours of August 31, 2014, while at Deuces Bar and Lounge in Memphis, Tennessee. The victim was friends with the owners of the bar, Mrs. Sammica Cash and Mrs. Toureshima Cash, and was at the bar on the night of August 30 and the early

morning hours of August 31 to celebrate Mrs. Sammica Cash's birthday. The victim was accompanied by a male friend, who had to leave early due to a prior obligation. The victim testified that although she rarely drank alcohol while out in public, she decided to have a few alcoholic drinks that night. Her friend bought her two mixed drinks while at the bar. The victim later had two glasses of champagne and a shot of tequila. The victim became intoxicated, and Mrs. Toureshima Cash took her into the VIP room to allow her to sleep until the Cashes could take her home.

The victim lay down in the VIP room on a couch which could be seen from the tables and the dance floor in the main area of the bar but was outside the view of a video camera inside the VIP room. She testified that she awoke to a man on top of her. The man was wearing a white t-shirt with words on it and either black or gray pants. She was wearing a blue dress and was not wearing underwear. The man was kissing her, and his fingers were in her "vaginal area." The victim stated that she felt "foggy" and that "I didn't come just out of the fog. I was trying to figure out in my mind what was going on, but I knew something wasn't right." The man performed oral sex on her.

The victim testified that while "[i]n the fog," she recalled getting up and moving to a couch that was within the view of the video camera. The man performed oral sex on her again. The victim stated that she was moved to another location where the man performed oral sex on her a third time. The man continued to kiss her. The victim stated that she smelled a condom and "that's when I came out of my fog because now I realized I was terrified." The man stopped and left the room. The victim could not recall whether she said anything aloud and stated that the man never spoke to her.

The victim stated that after the man left, she became angry and did not want him to "get away" with what he had done to her. She walked out of the room, met Mrs. Toureshima Cash, and told her that a man had been "doing things" to her and had tried to rape her. The victim described the man to Mrs. Toureshima Cash, who stated that she had just spoken to the man and ran outside after him. Mrs. Toureshima Cash came back inside, stated that she was trying to find the man, and then went back outside. The victim tried to follow her but was told to go back inside the bar.

Police officers were called to the scene, and the victim told them what had occurred. The officers then transported her to the Rape Crisis Center ("RCC"). The victim used the restroom before going to the RCC. She told a nurse what had occurred, and swabs of her vaginal area were taken.

On September 8, 2014, the victim met with a police officer, who showed her a photographic line-up. The victim identified a photograph of the man who she believed to the perpetrator, but she declined to make a positive identification. She explained that she

- 2 -

was not certain due to her condition at the time of the offense. The photograph that she identified as appearing to be the perpetrator was that of the Defendant.

On cross-examination, the victim testified that she did not know how long she was in the VIP room before the man entered the room. She did not know how she moved from one couch to another couch and explained, "I don't know if I got up and moved or [if] he moved me." She told the police officers that the man touched her vaginal area and that she believed he inserted his fingers into her vagina. On redirect examination, the victim explained that she gave her statement to the police officers at approximately 8:30 a.m. after she had been up all night.

The victim stated that she did not scream for help during the attack because she "was kind of in a fog" and "really didn't know what was going on." She further explained:

> I knew what was happening to a certain degree, but as I said, I was still in a fog as it was going on, trying to figure out why is this happening or what was happening. I technically knew what was happening, but it was still a fog. I'm coming out of a sleep, I had been drinking, it was just not an immediate reaction to what was going on.

The victim testified that sexual acts were not consensual.

The State introduced video recordings from the cameras in the VIP room and just outside the VIP room. The recordings showed that at approximately 4:00 a.m., the Defendant entered the VIP room, left the room, and then returned. A short time later, he moved the victim to another couch that was in the view of the camera. The Defendant held on to the victim and helped her walk, and the victim stumbled and appeared to fall at one point. The Defendant picked her up, helped her walk to the couch, and sat her down. The victim sat with her face in her hands, and the Defendant had to hold her up at one point while she continued to cover her face with her hands. The Defendant laid the victim down, got on top of her, and kissed her. He then put his face into her crotch area. At one point, the Defendant had to pry the victim's legs apart. He continued to kiss the victim, as she laid there with her head turned away and without reciprocating. The victim sat up, and the Defendant got off of her. The victim then stood up and walked out of the view of the camera. The Defendant then led the victim back toward the couch, picked up her, and took to her the couch. He got on top of the victim, and she pushed him away and sat up. The Defendant then walked out of the room. The victim stood up and stumbled out of the room, while wiping her eyes. The video recording lasted about four minutes.

Mrs. Sammica Cash and Mrs. Toureshima Cash also testified regarding their observations on the night of the offense. At some point during the party, they realized that the victim was intoxicated. They took the victim to Mrs. Sammica Cash's office and sat her in the chair. However, the victim was slumped over in the chair and appeared to be uncomfortable. Mrs. Toureshima Cash escorted the victim to the VIP room where the victim laid down on a couch. Mrs. Toureshima Cash stated that the victim was stumbling and that she did not believe that the victim could walk to the VIP room by herself. Mrs. Toureshima Cash put the victim's hands around her neck and helped her to the VIP room. The Cashes planned to take the victim home with them at the end of the party. They believed that the victim would not be bothered in the VIP room because the bar was nearing closing, they were cleaning the area, and only ten to fifteen people remained at the bar.

The victim later came out of the room and spoke to the Cashes. Mrs. Sammica Cash testified that the victim stated, "I was just sexually assaulted." Mrs. Toureshima Cash testified that the victim said either, "I thinking somebody raped me," or, "I felt like somebody did something to me." The victim was confused and in disbelief. She described her attacker, and Mrs. Toureshima Cash had seen a man matching the victim's description walk outside.

Mrs. Toureshima Cash walked outside the bar and learned from some men who were standing in the area that the man had entered a black Chevrolet Monte Carlo. She found the car, looked inside, and saw a man crouched down on the floor on the passenger side. She identified the man in a photographic line-up and at trial as the Defendant. She hit the car and yelled at the Defendant. She yelled at the men who were outside the bar that the Defendant had just raped a woman. The men came over and began hitting the car with sticks. The Defendant climbed to the driver's side of the car and started it. Mrs. Toureshima Cash ran to the front of the car and began hitting the hood. The Defendant began driving, and Mrs. Toureshima Cash had to move out of the way. The Defendant then drove away.

The Cashes contacted the police and provided officers with the car's tag number. Memphis Police Sergeant Sharon Kelley testified that the tag number was assigned to a minivan and that no one identified the owner of the minivan as the perpetrator.

Mrs. Sammica Cash later reviewed video recordings from the various cameras at the bar in an effort to locate the perpetrator. She said she saw a recording of the perpetrator's giving his telephone number to one of her friends earlier in the night. She obtained the perpetrator's telephone number from the friend and contacted the police. Sergeant Kelley researched the telephone number and found it listed as the Defendant's telephone number in a police report where the Defendant had been the victim of a crime.

Sergeant Kelley researched the tag number assigned to the Defendant's car and discovered it was registered to a Chevrolet Monte Carlo. Sergeant Kelley stated that the tag number assigned to the Defendant's car and the tag number provided by the witnesses differed by one or two digits. Sergeant Kelley prepared a photographic line-up that included the Defendant's photograph and subsequently had him arrested once witnesses identified him as the perpetrator.

On cross-examination, Sergeant Kelley testified that a DNA sample was collected from the Defendant. On redirect examination, she testified that she understood that the results of testing indicated that no DNA was found on the swabs taken from the victim.

Mr. Clemmie Osby, a former employee of the bar, testified for the State. Although Mr. Osby was incarcerated for an aggravated assault conviction at the time of trial, he maintained that no promises were made to him in exchange for his testimony. Mr. Osby was cleaning near the VIP room around closing time when he saw a man, whom he later identified in a photographic line-up as the Defendant, walk past him. A short time later, a woman walked by him. Upon learning that the Defendant had raped someone, Mr. Osby went outside to try to locate him. Mr. Osby saw the Defendant crouched down in a black Chevrolet Monte Carlo. The Defendant climbed into the driver's seat and drove away, while Mrs. Toureshima Cash yelled for someone to call the police.

On cross-examination, Mr. Osby testified that while he was cleaning near the VIP room, he did not hear anyone cry out or whimper. The victim did not say anything to him as she walked by him. Mr. Osby believed the victim was intoxicated because she was staggering. He acknowledged that he had no reason to believe that anything had happened to the victim when she initially walked past him.

At the conclusion of the proof, the State elected to submit to the jury the act of oral sex that occurred on the couch within the view of the video camera. The jury convicted the Defendant of rape absent consent and rape of a physically helpless victim. The trial court merged the convictions and imposed a nine-year sentence. The trial court denied the Defendant's motion for new trial, and the Defendant appealed.

## ANALYSIS

### I. Sufficiency

The Defendant asserts that the evidence is insufficient to support the rape convictions. He maintains that the evidence fails to establish that he knew or had reason

to know that the victim did not consent and was physically helpless. The State responds that the evidence was sufficient to support the convictions. We agree with the State.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

As it relates to this case, rape is defined as "unlawful sexual penetration of a victim by the defendant or of the defendant by a victim" where "[t]he sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent" or "[t]he defendant knows or has reason to know that the victim is … physically helpless." T.C.A. § 39-13-503(a)(2), (3). The term "sexual penetration" means "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body…." T.C.A. § 39-13-501(7). A "physically helpless" person is "unconscious, asleep or for any other reason physically or verbally unable to communicate unwillingness to do an act." T.C.A. § 39-13-501(5).

The Defendant does not argue that no sexual penetration occurred. Rather, he maintains that he did not know or have reason to know that the victim did not consent and that the victim was physically helpless. The victim and other witnesses testified to

the victim's level of intoxication on the night of the offenses, and the victim testified that she did not consent to the sexual penetration. When the Defendant entered the VIP room during the early morning hours, the victim was lying down on a couch. The video recording showed the victim stumbling and unable to walk without assistance. At one point, she fell, and the Defendant had to pick her up and lay her on the couch. The victim repeatedly turned her head away from the Defendant or dropped her head into her hands. The Defendant got on top of the victim and kissed her while she lay limp on the couch. He had to pry the victim's legs open, and the victim never reciprocated his actions. Once the Defendant left the room, he hid in his car and then fled the scene. We conclude that this evidence was sufficient to establish that the Defendant knew and had reason to know that the victim did not consent and was physically helpless. The evidence is sufficient to support the convictions.

## II. Closing Arguments

The Defendant asserts that the prosecutor commented during closing arguments on his constitutional right not to testify at trial. He also asserts that the prosecutor made improper comments during closing arguments by misstating the evidence, expressing a personal belief or opinion as to the truth or falsity of the evidence of his guilt, making statements designed to inflame the jury, injecting issues broader than his guilt or innocence, and referring to facts outside the record. The Defendant acknowledges that he did not object to the comments at trial but argues that the prosecutor's comments rise to the level of plain error. *See State v. Fusco*, 404 S.W.3d 504, 519 (Tenn. Crim. App. 2012) (providing that the failure to raise a contemporaneous objection to an allegedly improper closing argument waives the issue and that a defendant will not be entitled to relief unless he can demonstrate that the prosecutor's remarks constituted plain error); *see* Tenn. R. App. 36(a).

"When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). Five factors must be met before this court will conclude that plain error exists:

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted)). All five factors must be established before this court will recognize plain error and "'complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established.'" *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016) (quoting *Smith*, 24 S.W.3d at 283). "'When asserting plain error, the defendant bears the burden of persuading the appellate court that the trial court committed plain error and that the error was of sufficient magnitude that it probably changed the outcome of the trial.'" *Id.* at 505 (quoting *State v. Smith*, 492 S.W.3d 224, 232 (Tenn. 2016)).

## A. Comments on the Defendant's Right Not to Testify

Both the United States Constitution and the Tennessee Constitution "guarantee criminal defendants the right to remain silent and the right not to testify at trial." *State v. Jackson*, 444 S.W.3d 554, 585 (Tenn. 2014). This right prohibits a prosecutor from commenting on a defendant's decision not to testify at trial. *See Griffin v. California*, 380 U.S. 609, 614-15 (1965); *Jackson*, 444 S.W.3d at 585-86. Moreover, "'indirect references on the failure to testify also can violate the Fifth Amendment privilege.'" *Jackson*, 444 S.W.3d at 587 (quoting *Byrd v. Collins*, 209 F.3d 486, 533 (6th Cir. 2000)).

Our supreme court has adopted a two-part test for determining whether a prosecutor's remark constitutes an improper comment on a defendant's constitutional right to remain silent and not testify. *Id.* at 587-88. The reviewing court must consider "(1) whether the prosecutor's manifest intent was to comment on the defendant's right not to testify; or (2) whether the prosecutor's remark was of such a character that the jury would necessarily have taken it to be a comment on the defendant's failure to testify." *Id.* at 588.

The Defendant challenges the prosecutor's statement during closing arguments that "[t]here's no dispute that his actions were intentional." Prior to making the comment, the prosecutor argued:

> We know he's guilty of performing sexual penetration because you heard her testimony and you saw on the video him performing oral sex on her. And we know he did not have her consent, nor did he have any reason to think he did have consent because there was absolutely no communication and she was in no condition or state to even be able to give consent or be able to have any kind [of] conversation with her. This wasn't a boyfriend girlfriend, people went home and made bad decisions together and maybe they regret it the next day. This was a total stranger who took advantage of someone he didn't even know.

We conclude that the Defendant is not entitled to plain error relief because he has not demonstrated that a clear and unequivocal rule of law was breached or that any error probably changed the outcome of the trial. The context in which this statement was made does not establish that the prosecutor's manifest intent was to comment on the Defendant's right to testify. Our supreme court has recognized, however, that "a prosecutor's comments on the absence of any contradicting evidence may be viewed as an improper comment on a defendant's exercise of the right not to testify when the defendant is the only person who could offer the contradictory proof." *Jackson*, 444 S.W.3d at 586 n.45 (citing *United States v. Sandstrom*, 594 F.3d 634, 662-63 (8th Cir. 2010); *State v. Whitaker*, 277 P.3d 392, 399 (Idaho Ct. App. 2012)). A court is cautioned against taking "'too narrow a view of both the comment and the evidence'" and against lightly inferring that "'a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.'" *Sandstrom*, 594 F.3d at 662 (quoting *United States v. Gardner*, 396 F.3d 987, 992 (8th Cir. 2005)). The issue of whether a prosecutor's comment during closing argument that the State's evidence is "'unrefuted, uncontradicted, or unexplained'" constitutes an indirect comment on a defendant's failure to testify "'requires an analysis of the trial evidence and the context in which the comment was made.'" *Id.* (quoting *Gardner*, 396 F.3d at 991).

"'[T]he question is not whether the jury possibly or even probably would view the challenged remark in this manner, but whether the jury *necessarily* would have done so.'" *Id.* (quoting *Gardner*, 396 F.3d at 992). We cannot conclude that the prosecutor's comment was such that the jury "necessarily" would have taken it to be a comment on the Defendant's failure to testify. The comment was an isolated statement. Based on the context in which the statement was given, it was a reference to the strength of the State's proof, in particular, the strength of the victim's testimony and the video recording. *See United States v. Moore*, 129 F.3d 989, 993 (8th Cir. 1997) (holding that a prosecutor's statement that the evidence was "uncontracted" was of such character that the jury would have necessarily taken it to be a comment on the defendant's failure to testify but was a "reference to the strength and clarity of the government's evidence presented at trial"). Accordingly, the Defendant has failed to establish that the prosecutor's comment was a breach of a clear and unequivocal rule of law as to constitute plain error.

The Defendant also challenges the prosecutor's statement during his rebuttal closing argument that "[t]here is no dispute, there should be no dispute." The prosecutor made the statement while addressing defense counsel's contention during closing argument that the video recording showed that the encounter was consensual. After making the statement, the prosecutor continued, "The evidence is overwhelming in this case that he raped her. He took advantage of someone that was helpless, someone who

was vulnerable and passed out on the couch, someone he didn't even know, and he went back and raped this woman." We conclude that the context in which the statement was made does not establish that the prosecutor's manifest intent was to comment on the Defendant's right not to testify or that the jury necessarily would have taken it as such.

Finally, the Defendant challenges the following comments by the prosecutor during rebuttal closing argument:

> And think about if this was a consensual act, why did it stop? Why did he all the sudden get up and immediately just leave the bar if this was a consensual act? You've got this far, you found somebody, according to you she's into it and wants to do this, why would you leave then? Why would you hop up and leave? That doesn't make any sense. He left because at that point of time he had peeked around the corner and Clemmie was in there cleaning. He was going to get busted and so he leaves. If this was a consensual encounter between two adults, why not stick around? Why not find out what her name is? Why not get her number? Why not take her home then if this was consensual encounter between two adults? Because it was rape and now it's time to get out of dodge.

We again conclude that the context in which the statements were made does not establish that the prosecutor's manifest intent was to comment on the Defendant's right not to testify or that the jury necessarily would have taken it as such. Rather, the prosecutor was responding to defense counsel's argument that the encounter was consensual. Because we conclude that the comments were not improper, no clear and unequivocal rule of law was breached. The Defendant is not entitled to relief on this issue.

## B. Other Comments

"Closing arguments serve 'to sharpen and to clarify the issues that must be resolved in a criminal case'" and enable "'the opposing lawyers to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury.'" *State v. Hawkins*, 519 S.W.3d 1, 47 (Tenn. 2017) (quoting *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008)). Because counsel in criminal cases are "'expected to be zealous advocates,'" they are afforded "'great latitude in both the style and the substance of their arguments.'" *Id*. (quoting *Banks*, 271 S.W.3d at 130-31). Prosecutors, however, "must not lose sight of their duty to seek justice impartially and their obligation 'to see to it that the defendant receives a fair trial.'" *Id*. at 47-48 (quoting *Banks*, 271 S.W.3d at 131). Accordingly, "a prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." *Banks*, 271 S.W.3d at 131 (citations omitted). "[P]rosecutors, no less than defense counsel, may use

colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence, or make derogatory remarks or appeal to the jurors' prejudices." *Id*. (citations omitted). Although not exhaustive, this court has recognized five general areas of potentially improper prosecutorial argument: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused under controlling law, or making predictions regarding the consequences of the jury's verdict; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

However, "[a] criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *Banks*, 271 S.W.3d at 131. Instead, "[a]n improper closing argument will not constitute reversible error unless it is so inflammatory or improper that i[t] affected the outcome of the trial to the defendant's prejudice." *Id*. The following factors should be considered when making this determination:

> "(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the [c]ourt and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case."

*State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); *see also Goltz*, 111 S.W.3d at 5-6.

### 1. Misstating the Evidence

The Defendant contends that the prosecutor intentionally misstated the evidence or misled the jury as to the inferences that it might draw during closing arguments by stating, "This person's going to penile vaginally rape me." The prosecutor specifically stated, "It wasn't until she either she heard the condom wrapper or she smelled the condom that, finally, she comes to and realizes—she said she's terrified. She kind of realizes, oh my gosh, what's going on? This person's going to penile vaginally rape me." We conclude that the comment that the victim feared the Defendant was preparing to have intercourse with her while she was semi-conscious is a reasonable inference drawn from the victim's testimony at trial that hearing or smelling the condom caused her to

come "out of my fog because now I realized I was terrified." The comment was not improper.

The Defendant also challenges the prosecutor's statement that "So, after this happened and she kind of pops up, what's he do? [H]e immediately gets up and takes off." The Defendant argues that the video recording shows that he did not leave "immediately." However, the video recording shows that he left within a very short time, and the prosecutor's comment is a proper statement based on the evidence.

## 2. Expressing Personal Beliefs or Opinions

The Defendant challenges the multiple statements by the prosecutor as improper expressions of the prosecutor's personal beliefs or opinions as to the truth or falsity of any testimony or the Defendant's guilt. The statements of which the Defendant complains, which are italized, and the context in which they were made are as follows:

- "*We know it's the defendant*, he was identified by two witnesses and they talk about how the investigation focused on the defendant through his car tags, through the type car, through a phone number, and then through the photo line up, through witnesses that came out and pointed out that's the person. *We know he's guilty* of performing sexual penetration because you heard her testimony and you saw on the video him performing oral sex on her. And *we know he did not have her consent*, nor did he have any reason to think he did have consent because there was absolutely no communication and she was in no condition or state to even be able to give consent or be able to have any kind [of] conversation with her."

- "They bring up what about DNA? What about DNA? What in the world did we ever do before there was DNA evidence? You've gotta have DNA for everything. [Y]ou saw what happened on there. It would be one thing if we didn't have this video, just have her testimony, her saying this is what happened to me in that room and yes there's no DNA. She went to the bathroom and urinated, presumably wiped herself and there is no DNA. Does that mean this didn't happen? Of course not! You saw it happen. You heard her tell what happened to her and you see it happened. *The evidence is overwhelming, there is no[ ] question he is guilty of what he's been charged with.*"

- "*As we've talked about before, at the end of the day, I can s[i]t up here and we can play this video over and over. I can raise my voice and get upset by what I heard*, but at the end of the day it's up to you."

- "*I think the facts of this case are pretty simple*, albeit, these kind of cases sometimes aren't the things we want to talk about or hear about. Certainly you in this case had to see *a video that, I submit, is very troubling to watch*."

- "[The lesser included offenses] don't fully describe what the defendant did to [the victim]. *The defendant is guilty for the crime that he's been charged with and I'm going to ask that you return guilties as charged*."

- "You start with the charged case of rape. It's only if all of you unanimously agree that he's not guilty of rape that you even go down, look, and consider what the lesser included offenses are and *I will submit to you that you won't even have to get past that because you should find him guilty of rape*."

A prosecutor should not assert his or her personal opinion as to the credibility of a witness or as to a defendant's guilt or innocence. *Goltz*, 111 S.W.3d at 6; *State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999). The prosecutor, however, "may argue based upon an analysis of the evidence and the conclusion supported by the evidence." *State v. Damarkus Lowe*, No. E2017-00435-CCA-R3-CD, 2018 WL 3323757, at *25 (Tenn. Crim. App. July 6, 2018) (citing Tenn. S. Ct. R. 8, RPC 3.4(e)(3)), *perm. app. denied* (Tenn. Nov. 15, 2018). Whether the prosecutor's statements qualify as misconduct often is dependent upon the specific language used. *State v. Gann*, 251 S.W.3d 446, 460 (Tenn. Crim. App. 2007). "[A]rgument predicated by the words 'I think' or 'I submit' does not necessarily indicate an expression of personal opinion." *Id.* (citing *United States v. Stulga*, 584 F.2d 142, 147 (6th Cir. 1978)).

The statements of the prosecutor, when viewed in the context in which they were made, do not constitute expressions of personal opinions or beliefs regarding the credibility of a witness or the Defendant's guilt or innocence. Rather, the prosecutor made arguments based upon an analysis of the evidence and the conclusions supported by the evidence. The Defendant has failed to establish that the prosecutor breached a clear and unequivocal rule of law.

### 3. Inflaming the Jury

The Defendant maintains that the prosecutor made multiple statements in an effort to inflame the jury. He asserts that the prosecutor repeatedly emphasized that the victim and the Defendant did not know each other. The Defendant only cites to one page of transcript, and the prosecutor only mentions the fact that the Defendant and the victim did not know each other once. This statement was an accurate description of the evidence presented at trial and was not improper.

The Defendant next contends that the prosecutor's statement in which he repeatedly referred to the victim as a "dead body" was designed to inflame the jury. On three occasions, the prosecutor likened the victim to a "dead body" in an effort to describe the victim's limp state while she was intoxicated and as depicted in the video recording. The Defendant also challenges the prosecutor's use of sex crime examples outside the case at hand as inflammatory and argument of facts outside of the record. The prosecutor used an example of a child molestation case to explain the doctrine of election of offenses and a charge of aggravated rape to explain how a defendant could be charged with alternate theories of the same crime while ultimately being punished for only one crime. We conclude that these statements were inflammatory and that the statements regarding other sexual-related crimes fell outside of the record and were not matters of common knowledge. We address the effect of the improper comments below.

## 4. Injecting Broader Issues

The Defendant asserts that the prosecutor improperly injected issues broader than the issue of guilt or innocence by telling the jury to send a message by finding him guilty of the charges. The Defendant challenges the following statements by the prosecutor during the rebuttal argument:

- "It's up to you to let him know absolutely not. What you did to her is that right, and it's criminal, and it's not going to be tolerated. That's the message that you send to him."

- "You as the jury are the [conscience] of the community, and at the end of the day it's up to tell him[, if] you're not going to [take] responsibility for what you did then we will. What you did was horrendous, what you did was rape and we're going to hold you accountable for that. You send them that message and you let them know that by finding him guilty as charged."

"The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict." *Goltz*, 111 S.W.3d at 8. "Predictions as to the consequences of an acquittal on lawlessness in the community also go beyond the scope of the issues in the trial and are to be avoided." *Id.*

The first set of comments by the prosecutor was made in relation to his argument that the evidence established that the Defendant raped the victim and that the jury should

- 14 -

find him guilty of the charges as a result. By making the comments, the prosecutor did not ask the jury to send a message to the community or otherwise argue the need to general deterrence. Thus, we conclude that the comments were proper.

In the second set of comments, the prosecutor improperly appealed to the jury's sense of community and understandable distain toward sexual crimes. The State argues on appeal that the comments were limited to the specific circumstances of the case and did not relate to the need for general deterrence or matters other than the guilt or innocence of the Defendant. In support of its argument, the State speculates that an error may exist in the transcript and that the prosecutor may have said "him" rather than "them." If the State believed that such an error existed, it could have reviewed the recordings of the trial and sought correction of the record. The State failed to do so, and we decline the State's invitation to engage in such speculation. Rather, we conclude that the prosecutor's comments, as provided in the transcript, were improper. We address the effect of the improper comments below.

## 5. Arguing Facts Outside the Record

Finally, the Defendant maintains that the prosecutor argued facts outside the record. He challenges the prosecutor's statement that "[b]asically, we don't prosecute people in our criminal justice system for accidents" as relieving the State's burden of proving the *mens rea* element of the charges beyond a reasonable doubt. The prosecutor made this statement while explaining the *mens rea* elements of the rape charges and the evidence supporting this element. The statement did not effectively lessen the State's burden of proof.

The Defendant also challenges the prosecutor's comments that the victim "is physically helpless under the law" and "went to the bathroom and urinated, presumably wiped herself and there is no DNA." Neither statement involved matters outside the record. The State was required to establish that the victim was physically helpless as an element of one of the rape charges, and the prosecutor was merely arguing that the evidence supported this element. The prosecutor made the comment about the DNA during his rebuttal argument in response to defense counsel's argument regarding the lack of DNA, and the prosecutor's comment was a reasonable inference based on the proof.

However, we agree with the Defendant that the prosecutor's comments to the jury regarding merger and the possible punishment were improper. The prosecutor stated:

> The other thing I want to bring up—talk about is there's two counts [in] this case. There's two counts of rape, and I want to be clear to jurors in cases about this because it's not, like, one way of the rape is more serious or less

serious than the other and you get[ ] punished. And it's not like the State is trying to punish him twice for the act that he committed. There's called a Doct[rine] of Mergers that, basically, if you decide your verdict, if you decide that he's guilty of both counts, it's not like he gets sentenced to double for what he did. They merge together in one, it's alternative legal theories.

Tennessee Code Annotated section 40-35-201(b) provides:

In all contested criminal cases, except for capital crimes that are governed by the procedures contained in §§ 39-13-204 and 39-13-205, and as necessary to comply with the Tennessee Constitution, article IV, § 14 and § 40-35-301, the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged nor all lesser included offenses.

While the concept of merger implicates principles of double jeopardy, the merger of offenses also implicates sentencing concerns. *State v. Nicole Pamblanco*, No. M2015-01870-CCA-R3-CD, 2016 WL 6958888, at *8 (Tenn. Crim. App. Nov. 29, 2016), *perm. app. denied* (Tenn. Apr. 12, 2017). This court has held that a jury instruction regarding the merger of offenses provided the jury with information on possible punishment options in violation of section 40-35-201(b). *Id.* at *7-8. Likewise, the prosecutor's statements to the jury were improper comments on possible punishment options in violation of section 40-35-201(b).

### 6. Effect of the Improper Statements

While we have concluded that the prosecutor made multiple improper comments during his closing and rebuttal arguments, we cannot conclude that the comments were so inflammatory or improper that they affected the outcome of the trial to the Defendant's detriment. *See Banks*, 271 S.W.3d at 131. The evidence supporting the convictions was overwhelming. Such evidence not only included the victim's testimony but also a video recording of the rape, which clearly showed the victim in an intoxicated condition. Based on the overwhelming evidence of the Defendant's guilt, we hold that the prosecutor's improper comments did not adversely affect a substantial right of the Defendant. *See Smith*, 24 S.W.3d at 282. Thus, the Defendant has failed to establish plain error.

**CONCLUSION**

Upon reviewing the record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court.

_____

JOHN EVERETT WILLIAMS, PRESIDING JUDGE